CASAS OFFICE MACHINES,
INC., Plaintiff, Appellee,

v.

MITA COPYSTAR AMERICA, INC.,
et al., Defendants, Appellants.

No. 94–1067.

United States Court of Appeals,
First Circuit.

Heard June 8, 1994.

Decided Dec. 14, 1994.

Rehearing and Suggestion for Rehearing
En Banc Denied Jan. 18, 1995.

Ricardo F. Casellas, with whom Mario Arroyo, and Fiddler, Gonzalez & Rodriguez, San Juan, PR, were on brief, for appellants.

Luis A. Melendez–Albizu, with whom Luis Sanchez–Betances, Sanchez Betances & Sifre, Nilda M. Cordero de Gomez, and Jorge E. Perez–Diaz, Federal Litigation Div., U.S. Dept. of Justice, Hato Rey, PR, were on brief, for appellee.

Before TORRUELLA, Circuit Judge, CAMPBELL, Senior Circuit Judge, and BOUDIN, Circuit Judge.

LEVIN H. CAMPBELL, Senior Circuit Judge.

Mita Copystar of America, Inc. ("Mita") appeals from the district court's order granting summary judgment and issuing a permanent injunction in favor of Casas Office Machines, Inc. ("Casas"). The action began when Casas sued Mita and two fictitious defendants, John Doe and Richard Roe, in the Superior Court of Puerto Rico, San Juan Part. Organized under the laws of California and with its principal place of business in New Jersey, Mita removed the action to the United States District Court for the District of Puerto Rico. After removal, Casas, by an amendment to its complaint, replaced the fictitious defendants with two named defendants, Caguas Copy, Inc. and Oficentro J.P., Inc., which, like Casas, are Puerto Rico corporations. Complete diversity of citizenship between the parties was thus destroyed, although this fact was not called to the district court's attention at the time. The district court proceeded to deny Mita's motions to dismiss and for summary judgment, and it allowed Casas's motion for a permanent injunction enjoining Mita from impairing a contract entered into with Casas. Now, for the first time on appeal, Mita points out the jurisdictional problem caused by the addition of the nondiverse parties. Mita asks us to vacate the judgment below and order the district court to remand the action to the Superior Court of Puerto Rico. Mita also attacks the district court's decision on the merits, arguing that summary judgment was improper and that the district court erred in granting the permanent injunction.

## I.

Incorporated in Puerto Rico, Casas sells and distributes office and photocopying equipment in that Commonwealth. In 1983, Casas entered into an agreement with Mita, a supplier of office and photographic equipment, to distribute Mita products in Puerto Rico. As noted, Mita is a California corporation with its principal place of business in New Jersey. Following a period of strained business relations, Casas and Mita executed a second agreement in 1989 (the "1989 Agreement") granting Casas the exclusive right to distribute Mita's products in the "Greater San Juan" area. Paragraph 5 of the 1989 Agreement, however, provided that Casas's inability to meet or exceed 85% of a set sales quota would result in termination of the exclusivity provisions of the contract. Asserting that Casas had failed to achieve the 85% threshold, Mita terminated Casas's exclusive distribution rights—but retained Casas as a distributor—and designated two new distributors in the "Greater San Juan" area.

Casas responded on February 1, 1991, by suing Mita, John Doe, and Richard Roe[1] in

---

1. Paragraph 3 of Casas's complaint said:
 Codefendants John Doe and Richard Roe are fictitious names used to refer to defendants whose names are unknown at present. Said defendants are the natural persons and/or corporate and/or judicial entities who together with MITA have conspired, with knowledge of the contractual relationship between MITA and

the Superior Court of Puerto Rico, San Juan Part. Casas alleged that (1) Mita had deprived Casas of its exclusive distribution rights without just cause in violation of P.R.Laws Ann. tit. 10, §§ 278–278d 91976) (referred to in the complaint and hereinafter as "Law 75"), (2) defendants had conspired to deprive Casas of its right to sell and distribute Mita products, (3) Mita had impaired Casas's exclusive distribution agreement, and (4) defendants had intentionally interfered with Casas's contractual relationship with Mita. Casas sought preliminary and permanent injunctive relief, as well as monetary damages.

Alleging the existence of diversity jurisdiction, Mita removed the action to the United States District court for the District of Puerto Rico on March 6, 1991. Thereafter, Casas amended its complaint twice. An amendment filed on March 9, 1992, added a fifth count,[2] and eliminated Casas's request for a preliminary (but not a permanent) injunction. By a second motion to amend, brought on May 14, 1992, Casas sought to replace the fictitious defendants with Caguas Copy, Inc. ("Caguas") and Oficentro J.P., Inc. ("Oficentro")—the corporations that Mita had designated as new distributors in the Greater San Juan area upon terminating Casas's exclusive distribution rights. Paragraph 3 of Casas's Second Amended Complaint read:

> *Codefendants Caguas Copy, Inc. and Oficentro J.P., Inc. are, upon information and belief, corporate entities organized pursuant to the laws of the Commonwealth of Puerto Rico, with Principal offices located at Suite B–3, Goyco Street # 10, Caguas, P.R., and Diamante Street # 24, Villa Blanca, Caguas, P.R., respectively. Said defendants are the corporate and/or judicial entities who together with MITA*

have conspired, with knowledge of the contractual relationship between MITA and Casas, to deprive the latter of said contractual relationship, directly and indirectly interfering therewith, causing the damages hereinafter itemized. *To plaintiff's best knowledge and understanding, Caguas Copy, Inc. and Oficentro J.P., Inc. are citizens and residents of the Commonwealth of Puerto Rico and are also liable to plaintiff pursuant to the allegations mentioned hereinafter.*

(emphasis added). Four days later, on May 18, 1992, Casas moved the district court for an expedited review of its second motion to amend its complaint. Such review was necessary, said Casas, because Oficentro was under the protection of the United States Bankruptcy Court for the District of Puerto Rico—which had ordered that all creditors file their proof of claims on or before June 8, 1992—and Casas could not file a proof of claim until its motion to amend was granted. The district court allowed Casas's second amendment in early June 1992.

In the meantime, Mita had moved for summary judgment on February 12, 1992. It argued primarily that (1) Mita did not impair its contractual relationship with Casas because it merely enforced its rights under the terms of the 1989 Agreement, (2) even if it were found that Mita impaired its contractual relationship with Casas, Mita had just cause to do so, and (3) Casas's suit was barred by the equitable doctrine of laches. On March 16, 1992, Casas opposed Mita's motion for summary judgment, and brought a cross-motion for partial interlocutory summary judgment on its Law 75 claims (Counts One and Three), renewing its request for a permanent injunction.[3] Mita, in turn, filed, on

---

Casas, to deprive the latter of said contractual relationship, directly and indirectly interfering therewith, causing the damages hereinafter itemized. *To plaintiff's best knowledge and understanding, John Doe and Richard Roe are citizens and residents of the Commonwealth of Puerto Rico and are also liable to plaintiff pursuant to the allegations mentioned hereinafter.* (emphasis added).

**2.** Count Five alleged that defendants had illicitly and tortiously contracted for the distribution of Mita products in Puerto Rican territories in

which Mita had granted Casas the exclusive right to distribute its products.

**3.** In its original complaint, Casas had requested the district court to

issue a permanent injunction against Mita, ordering it [ (1) ] to cease and desist from continuing with the acts which constitute impairment of the terms of the distribution relationship existing between it and Casas, ... [ (2) ] to abstain from appointing, choosing, designating or arranging for other additional distributors and/or in substitution of Casas[,] and ... [ (3) ]

April 13, 1992, an opposition to Casas's cross-motion for summary judgment in which it maintained, *inter alia*, that (1) permanent injunctive relief is not available under Law 75, and (2) ordering permanent injunctive relief in this case would be unconstitutional. Finally, in a separate motion, filed on June 4, 1992, Mita sought to dismiss Casas's complaint on the grounds that Casas had engaged in a fraud upon the court.

The United States magistrate judge reviewed Mita's motions to dismiss and for summary judgment, as well as Casas's cross-motion for summary judgment. In a report and recommendation issued on September 2, 1993, the magistrate judge concluded that (1) Casas had not committed fraud on the court, (2) Casas was not barred by the doctrine of laches from pursuing its claims under Law 75, (3) Mita did not have just cause under Law 75 to terminate Casas's exclusive distribution rights because it failed to demonstrate that the quota provision in the 1989 Agreement was reasonable at the time of Casas's nonperformance, (4) a permanent injunction may be ordered under Law 75, and (5) Mita had impaired its contractual relationship with Casas. Consequently, the magistrate judge recommended that the district court deny Mita's motions to dismiss and for summary judgment, and grant Casas's cross-motion for summary judgment.

In its opinion and order filed on November 18, 1993, the district court adopted all of the magistrate judge's recommendations, thereby granting Casas's cross-motion for summary judgment on its Law 75 claims (Counts One and Three).[4] *Casas Office Machines v. Mita Copystar Machines*, 847 F.Supp. 981, 983 (D.P.R.1993). In a judgment entered the same day, the district court denied Mita's

motions to dismiss and for summary judgment, and granted Casas's motion for an injunction permanently enjoining Mita from impairing the 1989 Agreement *without just cause*.[5] Mita, pursuant to 28 U.S.C. § 1292(a)(1) (1988),[6] appeals from this interlocutory decision. Mita argues principally: (1) that diversity jurisdiction was defeated when Caguas and Oficentro were substituted for the fictitious defendants; (2) that the district court improperly entered summary judgment; and (3) that the district court improperly issued a permanent injunction.

## II.

Before we reach the issue of subject matter jurisdiction, we respond to Casas's challenge to our appellate jurisdiction. Casas maintains that, under *Carson v. American Brands, Inc.*, 450 U.S. 79, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981), jurisdiction under § 1292(a)(1) does not exist unless the appellant demonstrates that the district court's interlocutory order "might have a serious, perhaps irreparable, consequence, and that the order can be effectually challenged only by immediate appeal." 450 U.S. at 84 (internal quotations omitted). According to Casas, Mita has failed to satisfy these requirements. Casas's argument is not well taken.

■ The Supreme Court has said that § 1292(a)(1) provides appellate jurisdiction over two types of orders: those "that grant or deny injunctions and [those] that have the practical effect of granting or denying injunctions and have 'serious, perhaps irreparable, consequence[s].'" *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 287–88, 108 S.Ct. 1133, 1143, 99 L.Ed.2d 296 (1988) (quoting *Carson*, 450 U.S. at 84, 101

---

to abstain from terminating and/or altering the distribution relationship existing between both parties or performing any act or omission whatsoever in impairment thereof, all pursuant to the provisions of Law 75.

**4.** The district court did not decide Counts Two, Four, and Five of Casas's complaint, and, to our knowledge, they remain unresolved.

**5.** The district court emphasized in its opinion and order that it was not placing Mita in involuntary servitude. According to the district court, Mita could impair its contractual relationship

with Casas in the future if it could demonstrate just cause for doing so.

**6.** Section 1292(a)(1) provides in relevant part:

[T]he courts of appeals shall have jurisdiction of appeals from:

(1) Interlocutory orders of the district courts of the United States ..., or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court.

S.Ct. at 996–97). Thus, courts of appeals, in determining whether they have appellate jurisdiction under § 1292(a)(1), must, in the first instance, decide " 'whether the order appealed from specifically [granted or] denied an injunction or merely had the practical effect of doing so.' " *Morgenstern v. Wilson,* 29 F.3d 1291, 1294 (8th Cir.1994) (quoting *Kausler v. Campey,* 989 F.2d 296, 298 (8th Cir. 1993)). If the interlocutory order in question "expressly grants or denies a request for injunctive relief, the *Carson* requirements need not be met and the order is immediately appealable as of right under § 1292(a)(1)." *Morgenstern,* 29 F.3d at 1294–95 (observing that the majority of the circuits agree with this principle, and citing cases); *see Feinstein v. Space Ventures, Inc.,* 989 F.2d 49, 49 n. 1 (1st Cir.1993) (accepting appellate jurisdiction under § 1292(a)(1), and noting the distinction between "an interlocutory order which has the incidental effect of denying [or granting] injunctive relief" and an order that "clearly and directly grant[s] a[n] ... injunction"). On the other hand, "if an order merely has the practical effect of granting or denying an injunction, the *Carson* ... test[s] must be satisfied." *Morgenstern,* 29 F.3d at 1295.

■ Here, the district court's order expressly granted Casas's motion for an injunction barring Mita from impairing the 1989 Agreement without just cause. *Casas,* 847 F.Supp. at 990. Accordingly, for the reasons discussed, the district court's order was immediately appealable as of right, and Mita was not required to satisfy the *Carson* criteria. Thus, we have appellate jurisdiction. We now consider our subject matter jurisdiction.

### III.

■ Mita argues that there is no subject matter jurisdiction in federal court because complete diversity of citizenship was destroyed when the fictitious defendants were replaced with Caguas and Oficentro after removal. Although Mita raises this issue for the first time on appeal, we are obliged to address it because a defense of lack of jurisdiction over the subject matter is expressly preserved against waiver by Fed.R.Civ.P.

12(h)(3). *E.g., Halleran v. Hoffman,* 966 F.2d 45, 47 (1st Cir.1992). Casas responds that, diversity jurisdiction, once established at the time of removal, could not be lost by replacement of the fictitious defendants with Caguas and Oficentro, which Casas describes as nondiverse, *dispensable* parties. Alternatively, if jurisdiction was indeed defeated by the substitution of Caguas and Oficentro after removal, Casas asks us to restore it, *nunc pro tunc,* by dismissing the diversity-spoiling defendants *without prejudice.*

### A.

■ This case involves no federal question. Jurisdiction stands or falls upon diversity of citizenship. It has long been settled that a "lack of 'complete diversity' between the parties deprives the federal courts of jurisdiction over the lawsuit." *Sweeney v. Westvaco Co.,* 926 F.2d 29, 41 (1st Cir.) (citing *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806)), *cert. denied,* —— U.S. ——, 112 S.Ct. 274, 116 L.Ed.2d 226 (1991). There was complete diversity between the parties on March 6, 1991, when Mita removed the case to federal court: Casas is a Puerto Rico corporation, and Mita was incorporated in California and maintains its principal place of business in New Jersey. That the fictitious defendants, John Doe and Richard Roe, might reside in Puerto Rico—as suggested by Casas in the original complaint—was properly disregarded under 28 U.S.C. § 1441(a) (1988), which provides in relevant part: "For purposes of removal ..., the citizenship of defendants sued under fictitious names shall be disregarded." After removal, however, Casas replaced the fictitious defendants with Caguas and Oficentro, which were clearly identified as Puerto Rico corporations, like Casas itself. The issue is whether this substitution, which unquestionably destroyed complete diversity, also defeated federal subject matter jurisdiction. We hold that it did.

■ Casas argues that as diversity jurisdiction was established at the commencement of the proceeding, it was not later defeated by the mere naming of the fictitious parties, who were dispensable, not indispensable.

*E.g., Freeport–McMoRan Inc. v. K N Energy, Inc.,* 498 U.S. 426, 428, 111 S.Ct. 858, 859–60, 112 L.Ed.2d 951 (1991) (per curiam) (holding that, because there was complete diversity when the action commenced, diversity jurisdiction was not defeated by the addition of a nondiverse plaintiff, which was not indispensable); *Wichita R.R. & Light Co. v. Public Util. Comm'n,* 260 U.S. 48, 54, 43 S.Ct. 51, 53, 67 L.Ed. 124 (1922). Under the general principle reflected in the above cases, the existence of federal jurisdiction here might seem to depend simply upon whether Caguas and Oficentro were dispensable or indispensable parties. But "[f]ederal courts are courts of limited jurisdiction, and ... may exercise only the authority granted to them by Congress." *Commonwealth of Mass. v. Andrus,* 594 F.2d 872, 887 (1st Cir.1979); *e.g., Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 374, 98 S.Ct. 2396, 2402–03, 57 L.Ed.2d 274 (1978) ("The limits upon federal jurisdiction, whether imposed by the Constitution or by Congress, must be neither disregarded nor evaded."). Thus, specific legislative directives override the general principles announced in these cases, *e.g.,* 28 U.S.C. § 1367(b) (Supp. V 1993) (supplemental jurisdiction).[7] Here, as we explain below, Congress has indicated that federal diversity jurisdiction is defeated so long as, after removal, fictitious defendants are replaced with nondiverse, named defendants, regardless of whether they happen to be dispensable or indispensable to the action.

As part of the Judicial Improvements and Access to Justice Act of 1988, Pub.L. No. 100–702, 102 Stat. 4669 (1988), Congress enacted 28 U.S.C. § 1447(e) (1988), which provides:

> If after removal the plaintiff seeks to join additional defendants whose joinder would destroy subject matter jurisdiction, the court may deny joinder, or permit joinder and remand the action to the State court.

Although this provision relates expressly to joinder, the legislative history to the Judicial Improvements and Access to Justice Act of 1988 indicates that § 1447(e) applies also to the identification of fictitious defendants after removal. H.R.Rep. No. 889, 100th Cong., 2d Sess. 72–73 (1988), *reprinted in* · 1988 U.S.C.C.A.N. 5982, 6033 ("Th[e] provision also helps to identify the consequences that may follow removal of a case with unidentified fictitious defendants."); *e.g.,* Lisa Combs Foster, Note, *Section 1447(e)'s Discretionary Joinder and Remand: Speedy Justice or Docket Clearing?,* 1990 Duke L.J. 118, 121, 132 ("[I]f after removal the plaintiff identifies the Doe defendant as a nondiverse party, then pursuant to section 1447(e) the court may either deny joinder or permit joinder and remand.").

Federal courts and commentators have concluded that, under § 1447(e), the joinder or substitution of nondiverse defendants after removal destroys diversity jurisdiction, *regardless* whether such defendants are dispensable or indispensable to the action. *E.g., Yniques v. Cabral,* 985 F.2d 1031, 1034 (9th Cir.1993); *Washington Suburban Sanitary Comm'n v. CRS/Sirrine, Inc.,* 917 F.2d 834, 835 (4th Cir.1990); *Rodriguez by Rodriguez v. Abbott Lab.,* 151 F.R.D. 529, 533 n. 6 (S.D.N.Y.1993); *Vasilakos v. Corometrics Medical Sys., Inc.,* No. 93–C–5343, 1993 WL 390283, at *1–2 (N.D.Ill.1993); *Righetti v. Shell Oil Co.,* 711 F.Supp. 531, 535 (N.D.Cal.1989); David D. Siegel, *Commentary on 1988 and 1990 Revisions of Section 1441, in* 28 U.S.C.A. § 1441 (1994) (observing that when a plaintiff moves to substitute a nondiverse, named defendant for a fictitious defendant, "the plaintiff will meet the new subdivision (e) of § 1447, which leaves it entirely to the court to determine

---

7. Under 28 U.S.C. § 1367(b), for instance, federal courts, sitting in diversity, "shall not have supplemental jurisdiction ... over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure ... when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332." This statute, which refers expressly to both compulsory and permissive joinder, "does not allow joinder of additional parties if to do so would defeat the rule of complete diversity." Charles A. Wright, *Law of Federal Courts* § 9, at 38 (1994). Thus, where Congress has specifically so provided, the addition of nondiverse, dispensable parties will defeat diversity jurisdiction, even if such jurisdiction has already been established at the start of the federal proceeding.

whether to refuse the addition and keep the case or allow the addition and then remand the case for want of federal jurisdiction (caused by the loss of diversity)"); Foster, Note, *supra,* at 121 ("Significantly, section 1447(e) does not require the court, in considering whether joinder of a nondiverse party should be permitted to deprive the court of jurisdiction, to determine whether the party is 'indispensable' to the action according to Federal Rule 19(b). Unlike the approach under the Federal Rules, joinder of a non-indispensable party can deprive the court of jurisdiction."). We find these decisions persuasive. We conclude that diversity jurisdiction was lost in the present case when the court allowed Casas to identify the fictitious defendants as Caguas and Oficentro.

Section 1447(e)'s legislative history supports this conclusion. In enacting § 1447(e), Congress considered a proposal that would have allowed the joinder of certain nondiverse parties and, at the same time, permitted the district court, in its discretion, to keep the case and decide it on the merits. H.R.Rep. No. 889, 100th Cong., 2d Sess. 72–73 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5982, 6033–34 ("The most obvious alternative [to § 1447(e) ] would be to provide that 'the court may deny joinder, dismiss the action, or permit joinder and either remand to the state court or retain jurisdiction.'"); *see* David D. Siegel, *Commentary on 1988 Revision of Section 1447, in* 28 U.S.C.A. § 1447 (1994); Foster, Note, *supra,* at 137–38. Congress rejected the proposal, however, because it would have represented a "departure from the traditional requirement of complete diversity," and "provide[d] a small enlargement of diversity jurisdiction." H.R.Rep. No. 889, 100th Cong., 2d Sess. 72–73 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5982, 6033–34. We think that, had Congress decided that federal courts could retain jurisdiction over cases in which plaintiffs joined or substituted dispensable, nondiverse defendants after removal, it would have made that plain in § 1447(e).

This is not to say that it is unimportant whether a nondiverse defendant whom a plaintiff seeks to join or substitute after removal is dispensable or indispensable to the action. If the defendant is indispensable, the district court's choices are limited to denying joinder and dismissing the action pursuant to Fed.R.Civ.P. 19, or else allowing joinder and remanding the case to the state court pursuant to § 1447(e). *See Yniques,* 985 F.2d at 1035. If, on the other hand, the defendant is dispensable, the district court has the options, pursuant to § 1447(e), of denying joinder and continuing its jurisdiction over the case, or permitting joinder and remanding the case to state court.[8] *Id.* A district court may not, however, do what the court below did here, that is, substitute the nondiverse, named defendants for the fictitious defendants—thereby defeating federal diversity jurisdiction—and then continue to deal with the merits of the dispute.

### B.

■ Although diversity jurisdiction was defeated when Caguas and Oficentro were substituted for the fictitious defendants after removal, jurisdiction could be restored retroactively in appropriate circumstances, if Caguas and Oficentro were dispensable parties, by dismissing them from the action. In *Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989), the Supreme Court held that federal courts of appeals have the authority—like that given to the district courts in Fed. R.Civ.P. 21—to dismiss *dispensable,* nondiverse parties to cure defects in diversity jurisdiction. 490 U.S. at 832–38. Casas asks us to exercise this power here by dismissing Caguas and Oficentro *without prejudice.*

Courts may not, of course, dismiss *indispensable* parties from an action in order to preserve federal jurisdiction. But, contrary to Mita's assertions, we conclude that Caguas and Oficentro are dispensable parties. Mita's principal contention is that Casas is

---

8. "[A] district court, when confronted with an amendment to add a nondiverse nonindispensable party, should use its discretion in deciding whether to allow that party to be added." *Hensgens v. Deere & Co.,* 833 F.2d 1179, 1182 (5th Cir.1987) (describing factors that district courts may consider in deciding whether or not to permit the addition of dispensable, nondiverse parties).

barred by the doctrine of judicial estoppel from asserting that Caguas and Oficentro are dispensable parties because Casas, in a motion requesting relief from the automatic stay, represented to the United States Bankruptcy Court for the District of Puerto Rico that Oficentro is an indispensable party. In that motion, Casas argued in the bankruptcy court that:

> 2. Creditor CASAS wishes to duly serve process, litigate and try the above mentioned lawsuit in the U.S. District Court against Debtor [ (Oficentro) ], and the other defendants [ (Mita and Caguas) ] before a jury. *If CASAS is not allowed to serve process and litigate its claims against Debtor, CASAS would be effectively precluded from obtaining recovery under its tortious interference and contract in prejudice of third party's claims, due to a lack of an indispensable party. Concomitantly, CASAS' constitutional right to have a trial by jury on all its legally tenable claims would be impaired.*

(emphasis added).

■ While this assertion is manifestly at odds with Casas's present position, we are disinclined under all the circumstances to find that it created an estoppel. Judicial estoppel is a judge-made doctrine designed to prevent a party who plays "fast and loose with the courts" from gaining unfair advantage through the deliberate adoption of inconsistent positions in successive suits. *See Scarano v. Central R.R. Co.*, 203 F.2d 510, 513 (3d Cir.1953). Here, it does not appear that Casas succeeded in gaining any advantage as a result of its earlier inconsistent statement made to the bankruptcy court. While the court granted Casas's motion to lift the stay, it did so on grounds other than Casas's representation that Caguas and Oficentro were indispensable. Mita itself does not allege that it relied on or was prejudiced by the statement in any way. There is the further fact that Mita has played as "fast and loose" as has Casas with the issue of subject matter jurisdiction. It was Mita—the party

now seeking remand to the Commonwealth courts—that removed the case here. After the fictitious parties were identified, it made no effort to remand. Only after the district court ruled against it did Mita decide that federal jurisdiction was a mistake. We conclude that Casas is not estopped from taking the position it adopts now. *See Milgard Tempering, Inc. v. Selas Corp.*, 902 F.2d 703, 716–17 (9th Cir.1990); 18 Charles Wright et al., *Federal Practice and Procedure* § 4477, at 781 (Supp.1994).[9]

■ Mita next argues that Caguas and Oficentro are indispensable parties under a Federal Rules of Civil Procedure 19(b) analysis. It submits that, because the permanent injunction compels it to resume an exclusive distribution relationship with Casas in the Greater San Juan area, Caguas's and Oficentro's contractual rights to distribute Mita products in that area are necessarily canceled. Moreover, Mita points out that Casas is seeking a declaratory judgment decreeing Mita's distribution agreements with Caguas and Oficentro null and void. Under these circumstances, says Mita, this action cannot "in equity and good conscience" proceed without Caguas and Oficentro, which are entitled to protect their contractual interests. We are not persuaded. A leading commentator writes:

> When a person is not a party to the contract in litigation and has no rights or obligations under that contract, even though he may have obligated himself to abide by the result of the pending action by another contract that is not at issue, he will not be regarded as an indispensable party in a suit to determine obligations under the disputed contract, although he may be a Rule 19(a) party to be joined if feasible.

7 Charles A. Wright et al., *Federal Practice and Procedure* § 1613, at 199–200 (1986) (footnotes omitted) (citing cases); *see Ferrofluidics Corp. v. Advanced Vacuum Components, Inc.*, 968 F.2d 1463, 1472 (1st Cir.1992) (" '[I]t is generally recognized that a person

---

**9.** We agree with Casas that *International Travelers Cheque Co. v. Bankamerica Corp.*, 660 F.2d 215, 223–24 (7th Cir.1981) is distinguishable. In that case, the district court had expressly relied on plaintiff's previous statement that a party was indispensable. There was no such reliance in this case.

does not become indispensable to an action to determine rights under a contract simply because that person's rights or obligations under an entirely separate contract will be affected by the result of the action.' " (quoting *Helzberg's Diamond Shops, Inc. v. Valley West Des Moines Shopping Ctr., Inc.*, 564 F.2d 816, 820 (8th Cir.1977) (explaining the rationale for the rule))). The present case fits within this principle. As to Casas's request for declaratory judgment, Casas, in its appellate brief, "voluntarily relinquishes its request for a declaratory judgment seeking the annulment of [Caguas's] and [Oficentro's] dealership agreements."

Although the only claims before us on appeal are those alleging violation of Law 75, we note that Caguas and Oficentro are similarly dispensable parties with respect to the remaining claims. In each of the remaining claims, the defendants are alleged to be joint tortfeasors or co-conspirators and are thus jointly and severally liable. It is well-established that joint tortfeasors and co-conspirators are generally not indispensable parties. *See Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Int'l*, 982 F.2d 686, 691 (1st Cir.1993); 7 Charles Wright et al., *Federal Practice and Procedure* § 1623, at 346–47 (2d ed. 1986) ("[C]o-conspirators, like other joint tortfeasors, will not be deemed indispensable parties.")

That Caguas and Oficentro are dispensable to this action does not, in and of itself, compel their dismissal. While the Supreme Court held in *Newman–Green* that "the courts of appeals have the authority to dismiss a dispensable nondiverse party," 490 U.S. at 837, 109 S.Ct. at 2225, it "emphasize[d] that such authority should be exercised sparingly," *id.* The Court explained: "the appellate court should carefully consider whether the dismissal of a nondiverse party will prejudice any of the parties in the litigation. It may be that the presence of the nondiverse party produced a tactical advantage for one party or another." *Id.* at 838, 109 S.Ct. at 2225. In this context, Mita argues that Casas gained a tactical advantage by Caguas's and Oficentro's presence in

the case because Casas was able to obtain financial and business records under Federal Rules of Civil Procedure 33(a) and 34(a), which apply expressly to parties. We do not agree, however, with Mita's suggestion that these records would have been beyond Casas's reach had Caguas and Oficentro not been designated as parties. Under Fed. R.Civ.P. 34(c), "A person not a party to the action may be compelled to produce documents and things or to submit to an inspection as provided in Rule 45." [10]

Thus, neither Casas nor Mita gained a significant tactical advantage by the presence of Caguas and Oficentro in the lawsuit. Nevertheless, we are concerned that Caguas and Oficentro could themselves face prejudice if dismissed from this suit. Caguas and Oficentro, while initially characterized as John Doe and Richard Roe, were contemplated as parties to this litigation from the start, and have actively participated in it since June of 1992, when they were substituted for the fictitious defendants. Had the jurisdictional defect been called to the district court's attention at that point, the district court would have either dismissed Caguas and Oficentro from this action, thereby requiring Casas to sue them separately in the commonwealth court, or joined them to this action, thereby remanding the entire case to the commonwealth court. Either way, Caguas and Oficentro would have had their liability determined in a single proceeding. Instead, because of the jurisdictional oversight, dismissal of Caguas and Oficentro at this stage could subject them to a new lawsuit before a new judge in the Superior Court of Puerto Rico.

In *Newman–Green*, there was a similar difficulty. The problem there was remedied by terminating the litigation against the dismissed defendant with prejudice. 490 U.S. at 838, 109 S.Ct. at 2225–26. A similar remedy may be appropriate in this case. We note, however, that *Newman–Green* presents a stronger case than this one for dismissing the nondiverse party with prejudice, since the nondiverse party in that case had already had its claim adjudicated by the district court. Here, by contrast, Caguas and Ofi-

---

**10.** Mita baldly asserts that Casas could not have secured under Rule 45 the documents and infor-

mation it obtained under Rules 33 and 34. Mita fails, however, to explain why this would be so.

centro have not yet had their claims adjudicated by the district court. Since this case is closer than the case in *Newman–Green* and since this issue has not been argued by either party, we think it best to allow it to be decided initially by the district court, on remand, where the parties will have an opportunity to present their arguments.

 Accordingly, we dismiss Caguas and Oficentro from this action to preserve jurisdiction but direct the district court, on remand, to determine whether the injury to Caguas and Oficentro from being dismissed from this proceeding is such that their dismissal should be ordered to be with prejudice to any further suit by Casas. Caguas and Oficentro having been dismissed, complete diversity is restored per *Newman–Green,* and we retain subject matter jurisdiction over the claims between Casas and Mita.

### IV.

Having disposed of the jurisdictional issues, we come to the merits of Mita's appeal. This appeal, of course, is interlocutory, see note 6, *supra,* being taken solely from the granting of the injunction against Mita. But the injunction can stand only if the court properly awarded summary judgment. We accordingly confront the merits of that ruling.

 On summary judgment, we review the district court's decision *de novo. Velez–Gomez v. SMA Life Assur., Co.,* 8 F.3d 873, 874–75 (1st Cir.1993). A court of appeals will uphold summary judgment only if the record, viewed in the light most favorable to the nonmovant, reveals that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Mita's primary argument is that genuine issues of material fact preclude the granting of summary judgment to Casas on its Law 75 claims. Specifically, Mita argues that genuine issues exist as to: (1) whether Mita impaired its contract with Casas and (2) whether Mita had "just cause" to do so. To under-

stand these arguments, we will need to step back and take a look at the applicable law.

Law 75 protects Puerto Rico-based dealers from summary cancellation of their dealership contracts by their principal suppliers after the dealers have established a favorable market for the principal's goods. *See Warner Lambert Co. v. Superior Court of Puerto Rico,* 101 P.R.Dec. 378, 387 (1973), *translated in,* 1 Official Translations 527, 541 (1973). The stated purpose of the law is to protect local dealers from abusive practices by suppliers who are financially stronger than they are. *See Medina & Medina v. Country Pride Foods, Ltd.,* 88 J.T.S. 6162, 6168 (1988), *translated in,* 858 F.2d 817, 820 (1st Cir.1988). Toward that end, Law 75 prohibits suppliers from taking any actions that would impair such contracts, unless they have "just cause" for doing so:

> Notwithstanding the existence in a dealer's contract of a clause reserving to the parties the unilateral right to terminate the existing relationship, no principal or grantor may directly or indirectly perform any act detrimental to the established relationship or refuse to renew said contract on its normal expiration, except for just cause.

P.R. Laws Ann. tit. 10, § 278a.

 Law 75 establishes a rebuttable presumption of impairment when a supplier appoints another dealer in violation of its exclusive dealership agreement with its original dealer:

> For the purposes of this Act ... it shall be presumed, but for evidence to the contrary, that a principal or grantor has impaired the existing relationship ... when the principal or grantor establishes a distribution relationship with one or more additional dealers for the area of Puerto Rico, or any part of said area in conflict with the contract existing between the parties.

P.R. Laws Ann. tit. 10, § 278a–1(b)(2). The district court adopted the magistrate's determination that this presumption applied to Mita. Mita disputes this holding on appeal. However, Mita did not dispute impairment before the district court and, therefore, waived its right to make the argument on appeal. Even without the presumption,

moreover, Casas presented ample evidence of impairment of the exclusive dealership through Mita's appointment of Caguas and Oficentro, evidence which Mita did not dispute. *See, e.g., Draft–Line Corp. v. Hon Co.,* 781 F.Supp. 841, 844 (D.P.R.1991), *aff'd,* 983 F.2d 1046 (1st Cir.1993); *General Office Prods. Corp. v. Gussco Mfg. Inc.,* 666 F.Supp. 328, 331 (D.P.R.1987). Accordingly, the only issue on appeal is whether there was "just cause" for the impairment.

■ Law 75's "just cause" limitation applies even where a contract includes a clause providing for termination under specified circumstances. Because many such termination clauses were tied to distribution quotas or goals, amendments to Law 75 in 1988 clarified what "just cause" meant in the context of contracts that contain such clauses:

> The violation or nonperformance by the dealer of any provision included in the dealer's contract fixing rules of conduct or distribution quotas or goals because it does not adjust to the realities of the Puerto Rican market at the time of the violation or nonperformance by the dealer shall not be deemed just cause. The burden of proof to show the reasonableness of the rule of conduct or of the quota or goal fixed shall rest on the principal or grantor.

P.R. Laws Ann. tit. 10, § 278a–1(c) (1988). Thus failure to meet a distribution quota will only constitute just cause for impairment under Law 75 if that quota is shown to be "reasonable" given the state of the Puerto Rican market at the time of the alleged violation. *See Newell Puerto Rico Ltd. v. Rubbermaid, Inc.,* 20 F.3d 15, 22–23 (1st Cir.1994).

The contract between Mita and Casas granted Casas an exclusive dealership in the greater San Juan area, so long as Casas met 85% of a specific performance quota.[11] Mita terminated the exclusive dealership when, it alleges, Casas failed to meet 85% of the quota. Under Law 75, however, Mita could not impair its contract without just cause. Under the above provisions of Law 75, Mita had "just cause" to terminate the exclusivity provision only if the quota was adjusted to the realities of the Puerto Rican market at the time of Casas's failure to meet the quota. Moreover, Law 75 places on Mita's shoulders the burden of proving the reasonableness of the quota. Thus, once Casas moved for summary judgment and alleged an absence of evidence showing that the quota provision was reasonable, Mita was required to come forth with such evidence in order to survive summary judgment. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553–54 (Where the nonmovant has the burden of proof, the movant need do no more than aver "an absence of evidence to support the nonmoving party's case".); *Pagano v. Frank,* 983 F.2d 343, 347 (1st Cir.1993).

Mita contends that it submitted evidence sufficient to raise a genuine issue of material fact as to the reasonableness of the quota. It points to letters between its counsel and Casas's counsel, and a declaration by Masaharu Ishidoya, vice president of Mita's international division, describing the negotiation of the quota. Ishidoya's declaration indicated that Casas itself requested that the exclusivity provision be conditioned upon a yearly performance goal. At his deposition, Ishidoya indicated that the 300 copier quota in the contract was a negotiated reduction from a quota of 500 copiers first proposed by Mita. The 1989 contract contained express language in which Casas "acknowledges that the annual quotas … adjust to the realities of the market" in Puerto Rico. Ishidoya states in his declaration that he relied upon Casas's representations to that effect. Mita also submitted a copy of the letter it sent to Casas, terminating the exclusive dealership with Casas. In that letter, Mita stated it was terminating the exclusivity provision in the contract because Casas had failed to meet the quota percentages set forth in the contract.

Mita further submitted the declaration of Rafael Martinez Margarida, the Managing Partner and Partner-in-Charge of Manage-

---

11. The quota called for Casas to sell 300 copiers and to generate $450,000 in sales of such copiers during the first 13 months of the contract, between April 1, 1989 and April 30, 1990. Thus, to preserve the exclusivity provision, Casas had to sell 255 copiers (85% of 300). If Casas fell below 255 copiers, it could still retain a nonexclusive dealership unless its sales were 50% below quota, in which event Mita could terminate any relationship whatsoever.

ment Consulting Services at Price Waterhouse. Mita retained Martinez as an expert witness to testify as to the reasonableness of the contract quota. In his declaration, Martinez stated that he examined Puerto Rico's External Trade Statistics ("PRETS") for imports of copy machines to Puerto Rico for the period of 1985–1990. The declaration included the following table:

| YEAR | QTY. IMPORTED | VALUE | GROWTH OVER PRIOR YEAR |
|------|---------------|-------|------------------------|
| 1985 | 3,054 | 3,427,143 | N/A |
| 1986 | 4,170 | 6,058,273 | 77% |
| 1987 | 7,375 | 8,103,991 | 34% |
| 1988 | 6,026 | 8,148,662 | 1% |
| 1989 | 7,056 | 9,259,856 | 14% |
| 1990 | 8,983 | 10,032,200 | 8% |

Martinez noted that the value of imports increased every year between 1985 and 1990. Martinez also noted that the quota in the contract was a projection based on Casas's actual sales figures in 1985 (279 units), 1986 (153 units) and 1987 (230 units). Finally, Martinez noted that Casas's sales for 1989 (80 units) and 1990 (110 units) decreased significantly, while the overall number of imports increased during that same period. Martinez concluded that the quota was reasonable given the historical trend, that Casas "failed to capitalize on the opportunities available in a growing market," and that its failure to meet the quota "cannot be attributable to the conditions of the Puerto Rico market for photocopying machines."

Casas points to various alleged flaws in Martinez's methodology, and argues that these flaws require that his declaration be completely excluded as unprobative and incompetent. Casas argues that, in failing to deduct from the import figures the number of copiers exported from Puerto Rico, Martinez based his conclusions on an inaccurate picture of the internal copier market. Casas also argues that these same import figures include imports of all categories of copiers, not just the categories of copiers that Casas sold as part of its exclusive dealership agreement, and thus do not accurately reflect the precise market in which Casas was operating.[12] Casas also argues that the quota, although based on historical sales figures, unreasonably required Casas to double its market share in 13 months. Finally, Casas argues that Martinez failed to consider various relevant factors in his analysis, including the effect of increased intrabrand competition, changes in the number of dealers in the market, the effect of Hurricane Hugo, and the impact of the local economic recession. Accordingly, Casas argues, Martinez's declaration must be excluded, and Mita's remaining evidence is insufficient to raise a genuine issue of fact.

The district court found that Mita had failed to present evidence sufficient to raise a genuine issue as to the reasonableness of the quota. The court stated:

The magistrate found, and we agree, that the quota provision was unreasonable at the time of Casas' nonperformance. In support of its claim that the quota was reasonable, Mita presented an unsworn[13] declaration by Rafael Martinez Margarida, a certified public accountant (CPA). In this declaration the CPA asserted that his examination of the Puerto Rico External Trade's [sic] Statistics (PRETS) reflected a growing market for photocopying machine imports from the period of 1985 to 1990, inclusive. Thus, he concluded, Ca-

---

**12.** Casas also argues that the yearly data was irrelevant, since Mita must provide evidence about the market on or about May 1990, when the contract was terminated. This is plainly wrong. Law 75 requires Mita to prove the reasonableness of the quota "at the time of the violation or nonperformance by the dealer." P.R.Laws Ann. tit. 10, § 278a–1(c). Casas's alleged nonperformance occurred during the period between April 1989 and May 1990. Under the plain terms of Law 75, it is the condition of the market during that period that is relevant, not the condition of the market at the precise point of the contract's impairment by the supplier.

**13.** The unsworn declaration was made under pain and penalties of perjury. 28 U.S.C. § 1746.

sas' failure to meet the quota could not be attributed to market conditions.

As the magistrate found, Casas proved that Mita's argument was based on erroneous statistics. Among the factors cited by the magistrate which we find most convincing, the CPA's report failed to take into account essential aspects of the Puerto Rican market such as the effects of Hurricane Hugo and the recession on the economy. The CPA's report also failed to take into account the effect of intrabrand rivalry on Casas's market share, a rivalry fostered by Mita's impairment of Casas' exclusive distributorship.

Additionally, Mita's data as to the market for copying machines in Puerto Rico erroneously included types of copying apparatus that were not machines manufactured by Mita and sold to Casas. Thus, Mita's evidence exaggerated the size of the market by including within it devices such as thermocopying mechanisms, which were not among those apparatuses made and sold to Casas by Mita, and minimized market conditions by failing to include negative factors such as Hurricane Hugo, the recession, the intrabrand rivalry etc. Clearly, Mita's evidence fails to create a sufficient question to prevent the entry of summary judgment in Casas' favor since Mita has the burden of proving that the quota's [sic] were reasonable at the time of Casas' nonperformance, given the legal presumption that they were not unreasonable.

Thus, it was "unreliable, lacked probative value, and does not constitute competent evidence." [Citing Magistrate's Report.] Mita claims now that its failure to submit more probative evidence was due to its lack of time in which to gather and present it. We find this excuse pathetic and unconvincing.

*Casas,* 847 F.Supp. at 988–89. Mita argues that, in granting summary judgment to Casas, the district court exceeded its authority by improperly weighing the conflicting

evidence, *supra,* and deciding an issue of material fact, notably, that the quota provision was unreasonable at the time of Casas's nonperformance. In particular, Mita claims that the district court improperly discredited Martinez's testimony and that this constituted error since determinations of credibility and how much weight to accord testimony cannot be made at summary judgment and must be left to the fact finder at trial. *See Greenburg v. Puerto Rico Maritime Shipping Auth.,* 835 F.2d 932, 936 (1st Cir.1987).

Casas responds that the district court did not weigh Martinez's declaration, but instead properly excluded it under Fed. R.Civ.P. 56(e)[14]. Under Rule 56(e), affidavits supporting or opposing summary judgment must set forth facts that would be admissible in evidence. A district court may exclude expert testimony where it finds that the testimony has no foundation or rests on obviously incorrect assumptions or speculative evidence. *Quinones–Pacheco v. American Airlines, Inc.,* 979 F.2d 1, 6 (1st Cir. 1992) (excluding expert opinion where based on flawed assumptions); *Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666, 673 (D.C.Cir. 1977) (excluding expert testimony for failure to consider important factors). Such decisions are reviewed for abuse of discretion. *Quinones–Pacheco,* 979 F.2d at 6. Casas argues that the district court properly excluded Martinez's declaration as based on flawed data and, faced with a lack of evidence as to the reasonableness of the quota, properly entered summary judgment in its favor.

A. *Martinez's Declaration was not Excludable*

It is not clear that the district court meant to treat Martinez's declaration as excludable under Fed.R.Civ.P. 56(e). The court nowhere articulated such a ruling. But if we assume the court meant to exclude the declaration as incompetent for summary judgment purposes, we think it went too far. We may accept that Martinez's opinion, standing alone, was worth little more than the infer-

14. Fed.R.Civ.P. 56(e) provides:
 Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence,

 and shall show affirmatively that the affiant is competent to testify to the matters stated therein.
 Fed.R.Civ.P. 56(e).

ences a fact finder might reasonably draw from the factual data stated in his declaration. Martinez was not said to have had some special familiarity with, or expertise in, the Puerto Rico copier market, apart from the data he presented and sought to interpret. However, that data, including the PRETS and Casas's past sales figures, was admissible and, examined in a light most favorable to Mita, tends to support Martinez's conclusion that the quota was reasonable. We see no basis under Fed.R.Civ.P. 56(e) for excluding the entire declaration altogether.

 Under Rule 56(e), an affidavit must meet three requirements. It:

> [1] shall be made on personal knowledge, [2] shall set forth such facts as would be admissible in evidence, and [3] shall show affirmatively that the affiant is competent to testify to the matters stated therein.

Fed.R.Civ.P. 56(e). Unless a party moves to strike an affidavit under Rule 56(e), any objections are deemed waived and a court may consider the affidavit. *See Davis v. Sears, Roebuck & Co.,* 708 F.2d 862, 864 (1st Cir. 1983). The moving party must specify the objectionable portions of the affidavit and the specific grounds for objection. *See* 10A Charles Wright et al., *Federal Practice & Procedure* § 2738 at 507 (2d ed. 1983). Furthermore, a court will disregard only those portions of an affidavit that are inadmissible and consider the rest of it. *See Lee v. National Life Assur.,* 632 F.2d 524 (5th Cir. 1980) ("Where the affidavit includes both competent and incompetent evidence, the Court should disregard the incompetent evidence, but give full consideration to that which is competent.... This is nothing more than the procedure which would be followed at trial."); Wright, § 2738 at 509.

In moving below to strike the Martinez deposition under Rule 56(e), Casas made much the same arguments it now makes on appeal. Casas did *not* argue under the first clause in Rule 56(e) that Martinez lacked *personal knowledge* sufficient to testify as to the PRETS and sales figures. Nor did Casas argue under the third clause that Martinez was *incompetent* to provide his expert interpretation of these. Rather, Casas argued, under the second clause of Rule 56(e), that the facts contained in the declaration were not admissible in evidence because, in essence, they were simply not sufficiently material to, and probative of, the reasonableness of the quota.

The district court characterized the declaration as containing "erroneous statistics." *Casas,* 847 F.Supp. at 988. But neither Casas nor the court asserted that the figures in the declaration were not accurate reproductions of Puerto Rico's External Trade Statistics, nor did they dispute the correctness of the other data mentioned in the declaration. The court's reason for calling the statistics "erroneous" seems not to have been their inaccuracy as such but rather its belief that they did not constitute an accurate measure of the Puerto Rico copier market. The district court also criticized the alleged failure of Martinez's declaration to account for the impact of Hurricane Hugo, the effect of the local recession, and the impact of intrabrand rivalry, matters raised in Casas's materials.

But the increase in copier imports between 1989 and 1990, as reflected in the PRETS, implicitly rebutted Casas's evidence that the hurricane and the local recession had had a materially adverse effect on the Puerto Rican copier market. In finding that the declaration failed to consider these "essential aspects" of the market, the district court overlooked the relevant inference that could be drawn from the rise in copier imports shown in the PRETS figures.[15] *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Aponte–Santiago v. Lopez–Rivera,* 957 F.2d 40, 41

---

**15.** The cases that Casas cites in its brief, *Quinones–Pacheco* and *Merit Motors,* are distinguishable. In *Quinones–Pacheco,* the expert testimony with respect to damages was based on an assumption that was clearly unsupported by the record, namely that the plaintiff was permanently disabled. 979 F.2d at 6. Similarly, in *Merit Motors,* the expert testimony failed to account for significant factors that were clearly relevant to the issue at hand. 569.F.2d at 673. By contrast, in this case, it remains open to debate whether Hurricane Hugo, the recession, or intrabrand competition had an effect on the Puerto Rico market, and what that effect was, if any. The impact of these factors is precisely the issue to be resolved.

(1st Cir.1992) (the court at summary judgment "must view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party").

Casas's argument that the PRETS and other data did not account for the impact of intrabrand competition is more troubling. *See infra.* While the PRETS figures suggest that the market grew in spite of the hurricane and recession, they indicate nothing directly about the possible impact of increased intrabrand competition. However, it is one thing to note this silence of the evidence, another to exclude the PRETS figures because of it. Evidence may be relevant and admissible even though, standing alone, it fails to address every issue raised in a case. As noted below, Mita presented other evidence that arguably bolsters its position that the quota was reasonable. Given the unlikelihood of ever unearthing irrefutable statistical evidence, we do not think the PRETS and other statistics, and accompanying inferences, were so weak that they should be rejected as material evidence in this case.

The district court found that the PRETS figures were also "erroneous" because they included other categories of copying machines that were not the types of machines sold by Casas. *Casas,* 847 F.Supp. at 988. Casas pointed to the fact that the 1990 PRETS figure included imports of five categories of copiers, while Casas sold copiers in only three of these categories. This "exaggerated the size of the market." The absolute size of the market was not, however, the issue. Rather, the issue was the trend in the market, i.e. whether the market was increasing or decreasing, whether Casas's sales were consistent with the trend, and whether the quota was consistent with Casas's historical market share. Martinez explained in his deposition that it was necessary to include the additional categories in the 1990 PRETS figures in order to obtain comparable yearly data, since prior to that year the data for the copier market had not been broken up into the five subcategories. The inclusion of these categories did not necessarily make his testimony about the trend in the market any

less probative. Casas did not attack the comparability of the figures and failed to present evidence suggesting that excluding the categories, if this had indeed been possible, would have resulted in a different trend.

We conclude that the reasons set forth by the district court were insufficient bases for rejecting the Martinez declaration altogether, assuming this was what the court intended to do. Nor do we find Casas's additional arguments sufficient for its outright exclusion. Casas complains: that Martinez failed to deduct export figures from the import figures in order to obtain a true measure of the internal copier market; that Martinez failed to consider the fact that the quota, according to Casas, required Casas to double its market share within thirteen months; that Martinez failed to consider the fact that during the period of the contract, Casas had a smaller region of exclusive dealership than before.

While these additional arguments are not without force, a party may not exclude, on summary judgment, relevant and otherwise admissible factual evidence solely on the ground that the evidence leaves a number of unanswered questions or that it appears somewhat less persuasive than the movant's evidence offered in rebuttal. If there are genuine issues of fact, the nonmovant is entitled to have these resolved in the trial forum, where the fact finder hears live witnesses and can better assess all the facts.

We conclude—if the district court intended to do so—that it did not have sufficient grounds for excluding Mita's declaration under Fed.R.Civ.P. 56(e).

### B. *Sufficiency of Mita's Evidence to Raise Issue of Fact*

Having found no adequate basis to exclude from consideration Martinez's declaration, we next consider whether that declaration and Mita's other evidence were sufficient to raise a genuine issue of fact as to the reasonableness of the quota in light of the Puerto Rico market.[16]

---

16. Casas does not address this issue on appeal. Casas's only argument on appeal is that the dis-

trict court properly excluded the Martinez declaration. Although this could be interpreted as a

■■■■ It is instructive first to review the summary judgment standard. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment, the requirement is that there is no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). For a dispute to be "genuine," there must be sufficient evidence to permit a reasonable trier of fact to resolve the issue in the nonmovant's favor. *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 24 (1st Cir. 1989); *Astra Pharmaceutical Prod., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1204 (1st Cir.1983). The evidence cannot be merely colorable, but must be sufficiently probative to show differing versions of fact which justify a trial. However, the evidence must at all times be viewed in the light most favorable to the nonmovant, and all doubts and reasonable inferences must be resolved in the nonmovant's favor. *Adickes*, 398 U.S. at 158, 90 S.Ct. at 1608–09; *Rogen v. Ilikon Corp.*, 361 F.2d 260, 266 (1st Cir.1966). Moreover, this court may not weigh the evidence. Summary judgment "admit[s] of no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails...." *Greenburg*, 835 F.2d at 936. If the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the nonmovant.

■■■ Viewing Mita's evidence in its most favorable light, we think that, although the question is close, Mita's evidence and the reasonable inferences therefrom are sufficient to raise a genuine issue as to the reasonableness of the quota. First, the contract executed by the parties contains a clause in which Casas expressly agreed that the quota was reasonable in light of the realities of the Puerto Rico market. We do not suggest that such a clause was *binding,* since public policy would presumably not permit the provisions of Law 75 to be contracted away.[17] However, we think Casas's express agreement in the contract that the quota was reasonable is admissible evidence tending to establish the reasonableness of the quota at the time Casas signed the contract. Bolstering the weight of Casas's concession were the letters from Mita's attorneys and Ishidoya's testimony showing that Casas had been successful in renegotiating the quota downward from 500 to 300 copiers. Its ability to do so suggests a degree of parity in the parties' bargaining positions, making it more likely that Casas really believed the quota to be reasonable at the time it signed the contract.[18]

In addition, inferences from the PRETS and historical sales figures contained in Martinez's declaration suggest that if the quota was reasonable when the contract was signed, it remained so during the term of the contract. The contract required Casas to sell 255 copiers (85% of 300) during a 13–month period in order to retain its exclusive dealership. This figure was not grossly out of line with Casas's historical 12–month sales figures: (297 in 1985, 153 in 1986, and 230 in 1987). The PRETS figures indicate that the market for copiers actually increased during the term of the contract (from 7,056 in 1989 to 8,983 in 1990). If the quota was based roughly on past sales, and if the market for

concession that summary judgment was improper if the Martinez declaration was admissible, we nevertheless proceed to address the key summary judgment issue.

17. *Cf.* P.R. Laws Ann. tit. 31, § 3372 (1991) ("The contracting parties may make the agreement and establish the clauses and conditions which they may deem advisable, provided they are not in contravention of laws, morals, or public order."); *In re Pagan Ayala,* 117 D.P.R. 180, 187 & n. 4 (1986), *Translated in,* 17 Official Translations 216, 223 & n. 4 (1986) (suggesting that contracts exempting attorneys ex ante from malpractice suits are void).

18. Casas argues that any evidence of reasonableness of the quota at a time prior to the period of nonperformance was irrelevant here. However, viewed in the light most favorable to Mita, we think that evidence of reasonableness immediately prior to the term of the contract was material. Combined with Martinez's declaration indicating that the Puerto Rico copier market did not subsequently decrease, but rather grew, this evidence is probative of the continuing reasonableness of the quota between April 1989 and May 1990, the relevant period. *See* note 12, *supra.*

copiers did not suffer any decrease, it could be inferred from this evidence that the quota was reasonable in light of the Puerto Rico market.

Casas, to be sure, presented much persuasive evidence in opposition. Summary judgment, however, is not a substitute for trial. We do not think Casas's evidence so undermined Mita's case that Mita can be said to have failed to raise a genuine issue of fact concerning the reasonableness of the quota. At most, it indicated that many issues of fact remained to be resolved at trial. Casas presented a declaration by its president, stating that he thought the quota unreasonable and that Mita had imposed the quota unilaterally by threatening to cancel their preexisting distribution relationship. Mita's vice president, however, asserted that he "relied on Casas' representations that the performance goal and the related percentages were reasonable for the relevant market." Mita's evidence tends to suggest that the quota was arrived at through bargaining, Casas having persuaded Mita to lower the quota from 500 to 300 copiers. The Casas declaration also states that Hurricane Hugo and the local recession had an effect on the copier market. As we have previously said, however, Mita's PRETS figures minimized these effects by showing that the copier market increased during the term of the contract.

Casas's strongest argument is that Mita's statistical evidence of market growth and of past sales fails to account for the fact that, prior to 1988, Casas was the only distributor of Mita products for all of Puerto Rico (even though its contract then was nonexclusive). By contrast, during the term of the contract, Casas argues, it faced stiff intrabrand competition. Its exclusive dealership covered only a portion of Puerto Rico, the greater San Juan area. While it could also sell Mita products elsewhere in Puerto Rico on a nonexclusive basis, it now faced competition from two other authorized Mita dealers outside the exclusive San Juan area as well as from alleged unauthorized sales of Mita's copiers by Caguas and Oficentro. According to Casas, its competitors sold 327 Mita copiers during the 13-month period of the contract. Casas argues that Mita's past sales figures simply do not address the issue of this increased intrabrand competition, hence they say nothing as to the quota's reasonableness during the relevant period.

But we do not think that this argument so undermines Mita's case as to eliminate any contested factual issue. It is unclear how to assess the effects of intrabrand competition in calculating the reasonableness of the quota. The fact that other nonexclusive dealers were able to sell 327 Mita copiers during the relevant period outside of San Juan is a double-edged sword. While, to be sure, these sales suggest that Casas faced stern competition, it also indicates the existence of a strong demand for Mita copiers on which Casas was presumably free to capitalize to the extent it was capable. It is unclear, moreover, in measuring quota reasonableness, how intrabrand competition is to be distinguished from the effects of competition from copiers made by other manufacturers. Such interbrand competition would have existed earlier as well as in 1989–90. While the new factor of intrabrand competition doubtless weakens the predictive value of Casas's earlier sales figures, it does not totally vitiate their relevance to quota reasonableness. Casas knew when it signed the contract that its exclusivity would be limited to the San Juan area, and presumably also knew of the intrabrand competition it faced elsewhere. The evidence permits an inference that in Casas's then judgment the quota was reasonable despite the anticipated interbrand and intrabrand competition. Thereafter, the overall trend in copier imports was up suggesting—at least, as one possible interpretation of the data—that Casas's poor performance was due not to lack of opportunity but to some fault of its own.

We conclude that Mita presented evidence sufficient to raise a genuine issue as to the reasonableness of the quota. Particularly where the standard here, "reasonableness," is so amorphous, and "hard" evidence to prove "reasonableness" so obviously difficult to come by and subject to multiple interpretations, we are disinclined to deny Mita its day in court by raising the threshold barrier of proof too high. *See Rogen*, 361 F.2d at 265–66 (suggesting that delicate issues of fact

"may well indicate a preference for the antennae of the factfinder over the cruder instrument of summary judgment"); *Newell*, 20 F.3d at 23 (deferring to the jury's judgment that supplier failed to meet its burden of proving that a quota was "reasonable" under Law 75). To the extent that we have doubts about the appropriateness of summary judgment, we are required to resolve them in Mita's favor.

Throughout its brief, Casas repeatedly asserts that Mita has failed to satisfy its burden of proving that the quota is reasonable. This misapprehends the burden Mita faces at summary judgment. Mita is not required to prove that the quota was reasonable. Rather it was only required to present evidence sufficient to raise a genuine issue of fact as to reasonableness. The burden is one of producing enough evidence to show that it is entitled to a trial, not that it will necessarily be successful at trial. *See First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1966) ("It is true that the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.") We believe Mita has satisfied this burden. We conclude that Mita has presented evidence sufficient to raise a genuine issue of material fact as to the reasonableness of the quota given the condition of the Puerto Rican copier market. Weighing the evidence, assessing the credibility of the experts: these are task that must be left to the trier of fact.[19]

## V.

In accordance with this opinion, we hereby dismiss Caguas and Oficentro from this suit and remand to the district court to determine whether the dismissal of Caguas and Oficentro should be with or without prejudice. Having determined that the district court erred in granting Casas's motion for partial summary judgment, we vacate the court's order granting Casas a permanent injunction. The parties' claims will proceed in the district court consistently with this opinion.[20]

*So ordered. Each party shall bear its own costs.*

---

19. Without making too much of this, we note that Casas in its brief almost concedes that there exist disputed issues of fact. After listing the evidence it presented about the unreasonableness of the quota, it states: "Among others, this evidence raises material questions of fact as to the effect of Hurricane Hugo, the recession, the intrabrand competition of MITA machines, and the manipulation of statistical information by MITA's expert in order to artificially create a 'growing market'." We agree.

20. We do not reach Mita's remaining argument that, even if summary judgment was proper, the district court's issuance of the permanent injunction was improper.