70 F.3d 1262
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Jeffrey PARKER, Plaintiff-Appellant,
v.
CENTRE GROUP LIMITED PARTNERSHIP, d/b/a The Capitol Centre;
Washington Hockey Limited Partnership, d/b/a Washington
Capitols Hockey Club; Hartford Whalers Hockey Club Limited
Partnership; National Hockey League, Defendants-Appellees.
 No. 95-1126.
 United States Court of Appeals, Fourth Circuit.
 Dec. 4, 1995.
 
 ARGUED: Clayton Michael Robinson, Jr., St. Paul, Minnesota, for Appellant. Paul T. Cuzmanes, WILSON, ELSER, MOSKOWITZ,
 EDELMAN & DICKER, Baltimore, Maryland, for Appellees. ON BRIEF: Gerald D. Freed, Cynthia L. Ambrose, WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, Baltimore, Maryland, for Appellees.
 Before ERVIN, Chief Judge, and RUSSELL and HAMILTON, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Jeffrey Parker (Parker) appeals the district court's grant of summary judgment to the defendants, the National Hockey League, the Centre Group Limited Partnership, the Washington Hockey Limited Partnership (Capitols), and the Hartford Whalers Hockey Club Limited Partnership (Whalers), on Parker's Maryland state law negligence claims. We affirm.
 
 
 2
 * Between 1986 and March 1991, Parker played hockey professionally. On March 12, 1991, Parker, who was then playing for the Whalers, played in a game against the Capitols in Landover, Maryland at the Capitol Centre, a complex owned by the Centre Group Limited Partnership (Capitol Centre group). In the third period of the game, a player for the Capitols checked[1] Parker into a padded, metal standard designed to hold the plexiglass panels that surrounded most of the hockey rink. After being checked into the padded, metal standard, Parker fell, hit his head on the ice, and suffered a career ending injury.
 
 
 3
 The padded, metal standard was located on the rink edge of the photographers' box, which was "directly across the ice" from the teams' benches. (J.A. 39). In order to allow the photographers to take clear pictures, the box was not shielded by a protective plexiglass panel. The absence of the plexiglass panel created a four foot wide gap in the area of the hockey rink's perimeter.
 
 
 4
 In 1985, the National Hockey League (NHL) passed a resolution mandating "that all NHL rinks be equiped [sic] with protective glass around the entire perimeter of the rink area with the exception of [the] area immediately in front of both player [sic] players' benches." (J.A. 52). Thus, the teams' benches at the Capitol Centre were not shield by plexiglass panels. Despite the NHL's resolution, the photographers' box at the Capitol Centre was not shielded by a plexiglass panel until after Parker's injury.
 
 
 5
 Before Parker joined the Whalers, he had played with the Buffalo Sabres. As a member of the Buffalo Sabres, Parker admitted that he had played at the Capitol Centre at least two times in the late 1980s. (J.A. 110). During that time, the photographers' box was not shielded by a plexiglass panel because one was not installed to shield the photographers' box until sometime in 1991 or 1992. (J.A. 47).
 
 
 6
 After his injury, Parker sued the NHL, the Capitol Centre group, the Capitols, and the Whalers, claiming his injury occurred as a result of their negligence. After the parties conducted discovery, the defendants moved for summary judgment. The district court granted the defendants' motion finding that Parker assumed the risk of his injuries. Parker timely filed this appeal.
 
 II
 
 7
 We first consider our subject matter jurisdiction over this case, an issue we raised sua sponte at oral argument. Parker is a citizen and resident of Minnesota. The NHL is an unincorporated association and, therefore, is a citizen of every state in which one of its members is a citizen. See United Steelworkers v. R.H. Bouligny, Inc., 382 U.S. 145 (1965) (holding a labor union is considered a citizen of every state in which one of its members is a citizen). At the time Parker filed his complaint on September 28, 1992, the NHL had a member team located in Minnesota;[2] thus, complete diversity of citizenship was absent. See Freeport-McMoran, Inc. v. K N Energy, Inc., 498 U.S. 426, 428 (1991) (per curiam ) ("[T]he well-established rule [is] that diversity of citizenship is assessed at the time the action is filed."). Therefore, the appeal should be dismissed, see Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267 (1806), unless we can dismiss the NHL as a dispensable, nondiverse party. See Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 837 (1989) (appellate courts have the power to dismiss dispensable, nondiverse parties to cure defects in diversity jurisdiction). In determining whether to dismiss a dispensable, nondiverse party, Newman-Green instructs us to exercise this authority "sparingly" and to consider whether any of the parties in the litigation will be prejudiced. Id.
 
 
 8
 We believe this is an appropriate case to exercise our authority to dismiss the NHL as a dispensable, nondiverse party. Because all of the defendants would be jointly and severally liable under Maryland law should Parker prevail, see MD. ANN. CODE art. 50, Sec. 16 (1994), the NHL cannot be considered indispensable to this action. See Newman-Green, 490 U.S. at 837 (finding that "it cannot be argued that [the nondiverse party] was indispensable to the suit" because all the parties were jointly and severally liable); Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668, 677 (1st Cir.1994) ("It is well-established that joint tortfeasors ... are generally not indispensable parties.").
 
 
 9
 Our finding that the NHL is a dispensable party, by itself, does not compel the NHL's dismissal from this case. See Casas Office Machs., 42 F.3d at 677. If the NHL's presence in this action produced a tactical advantage for Parker, then we would not exercise our authority to dismiss it. Our review of the record does not indicate that Parker gained any advantage by having the NHL included as a defendant. In addition, the defendants do not argue that Parker gained any advantage by having sued the NHL. Accordingly, we find this case appropriate to exercise our authority to dismiss a dispensable, nondiverse party, and therefore, we dismiss the NHL from this suit.
 
 III
 
 10
 * We review de novo a grant of summary judgment. See Cooke v. Manufactured Homes, Inc., 998 F.2d 1256, 1260 (4th Cir.1993). The district court is required to enter judgment against a party who, "after adequate time for discovery ... fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To prevail on a motion for summary judgment, a party must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) the party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
 
 
 11
 Ordinarily, a party may not rest on its pleadings, but must demonstrate that specific, material facts exist that give rise to a genuine issue of material fact. See Celotex, 477 U.S. at 324. In the present case, however, Parker initially could rest on his pleadings because the defendants would have the burden of proof at trial as to whether Parker assumed the risk since that defense is an affirmative one. Hooper v. Mougin, 284 A.2d 236, 238 (Md.1971). Parties asserting affirmative defenses bear the burden of proving those defenses at trial. Id. Only after the defendants had met their initial burden of production was Parker required to demonstrate that specific, material facts existed that gave rise to a genuine issue of material fact. See Celotex, 477 U.S. at 324. In making this showing, Parker was required to show that more than a scintilla of evidence existed to support his position. Anderson, 477 U.S. at 252. He had to come forward with evidence on which the jury could reasonably have found for him. Id.
 
 B
 
 12
 Parker argues the district court erred in concluding he assumed the risk of being checked into the padded, metal standard in the photographers' box. We disagree.
 
 
 13
 Under Maryland law, the defense of assumption of the risk "arises when the plaintiff knows of and appreciates a risk and voluntarily chooses to encounter it." Leakas v. Columbia Country Club, 831 F.Supp. 1231, 1236 (D.Md.1993) (citing Hooper v. Mougin, 284 A.2d 236, 238 (Md.1971)). Determining whether the plaintiff knows of and appreciates the risk is an objective test. Schroyer v. McNeal, 592 A.2d 1119, 1123 (Md.1991). Thus, the court may find, as a matter of law, that one has assumed the risk "when it is clear that a person of normal intelligence in the position of the plaintiff must have understood the danger." Id. In determining whether a normal person in Parker's position would have noticed the absence of the plexiglass shield in front of the photographers' box, we give great weight to Parker's experience as a professional hockey player. His "awareness of risk is not to be determined in a vacuum. It is, rather, to be assessed against the background of [his] skill and experience ... and in that assessment a higher degree of awareness will be imputed to a professional than to one with less than professional experience in the particular sport." Maddox v. City of New York, 487 N.E.2d 553, 556-57 (N.Y.1985) (citations omitted).
 
 
 14
 There is little doubt that Parker knew of the danger, appreciated it, and voluntarily encountered it. First, Parker had played hockey since he was five years old and had played professionally since 1986. Second, Parker knew of the roughness involved in hockey because he had been injured many times. Indeed, on one previous occasion, Parker had been injured after hitting a metal standard in a penalty box. Third, Parker had played at the Capitol Centre in two previous games, and on those occasions, the photographers' box was not shielded by the protective plexiglass. Fourth, before the game in question, Parker undoubtedly was on the ice during the Whalers' pre-game warm-up drills. See Heldman v. Uniroyal, Inc., 371 N.E.2d 557, 566-67 (Ohio Ct.App.1977) (noting tennis player had opportunity during twenty minute warm-up session to discover defect in court). Fifth, the photographers' box was directly across from the teams' bench area, an area which itself was not shielded by plexiglass. Finally, Parker's injury occurred late in the game. Under these circumstances, we have no doubt that a person of normal intelligence in Parker's position would have discovered the absence of the plexiglass shield in front of the photographers' box and would have understood the risk of being checked into the padded, metal standard. By deciding to participate as a player in the hockey game, Parker voluntarily chose to accept the risk.
 
 IV
 
 15
 For the reasons set forth above, the judgment of the district court is affirmed.
 
 
 16
 AFFIRMED.
 
 
 
 [1]
 In hockey, the term "check" is used to describe the various ways that hockey players use their bodies to block the progress of opposing players, such as using one's body to block another player into the sideboards of the hockey rink
 
 
 [2]
 The team, the Minnesota North Stars, was still located in Minnesota when Parker filed his amended complaint on December 29, 1992