**RAYTHEON–CATALYTIC, INC., Plaintiff,**

v.

**GULF CHEMICAL CORPORATION and First Oil International, Ltd., Defendants.**

**Civil No. 96–1541 CCC.**

United States District Court, D. Puerto Rico.

March 14, 1997.

Eric Pérez–Ochoa, San Juan, P.R., Jonathan M. Albano, Bingham Dana & Gould, Boston, MA, for Plaintiff.

Rubén T. Nigaglioni, Santurce, P.R., Francis J. Deasey, Philadelphia, PA, for Defendants.

## MEMORANDUM OPINION

CEREZO, Chief Judge.

Raytheon Catalytic, Inc. (RCI) filed a verified complaint on May 3, 1996 seeking specific performance of the terms of a Payment Agreement (P.A.) between it and Gulf Chemical Corp. (GCC) and claiming breach of contract of a Field Services Agreement (FSA)[1] and the P.A. between the parties. The FSA, entered into on May 16, 1995, provided for the construction and maintenance services, to be rendered by RCI to GCC, which were required for the refurbishment of GCC's refining and petrochemical facilities at Peñuelas, Puerto Rico.

On May 3, 1996, upon urgent motion for provisional remedies to secure satisfaction of judgment, the Court entered an "Order to Record Cautionary Notice and Prohibit Alienation of Property Located In Peñuelas," directing the Registry of Property, First Section of San Juan, to record cautionary notices of the pendency of this civil action upon two parcels of land described in detail therein and prohibiting the selling and encumbering of the same. Defendant GCC and First Oil International (FOI) filed on May 6, 1996 an Urgent Motion to Set Aside the Ex-parte Order (docket entry 7) and requested a hearing which was held on September 17 and 18 and November 12 and 13, 1996. Post-hearing briefs were simultaneously filed (docket entries 123 and 124), followed by reply memoranda (docket entries 125 and 126) and a sur-reply (docket entry 129).

After an in-chambers conference, it was agreed that the threshold issue that had to be addressed at the provisional remedies hearing was whether the P.A., Joint Exhibit I, dated March 29, 1996, was an enforceable contract. Defendant's GCC's theory of non-enforceability is two-pronged: 1) that the P.A. is not enforceable since the parties created a separate written escrow agreement which modified the same, and 2) that through such escrow agreement the P.A. became unenforceable until fulfillment of two suspensive conditions, to wit, payment of the amount of $4.5 million and execution of collateral documents. GCC's position is defined in its post-hearing memorandum filed on December 17, 1996 (docket entry 124), where it is specifically stated, at page 16, that section 12.3 of the P.A. permits an amendment and/or waiver of its provision by a written Instrument and that "[t]he Escrow Agreement is precisely a written Instrument which amended and/or waived provisions of the Payment Agreement." At page 12 of said memorandum, GCC claims that RCI knew that the P.A. was unenforceable until fulfillment of the suspensive conditions. it then goes on to argue that, since the collateral documents were "never completed, executed or filed" due to the bad faith of RCI, the second suspensive condition never occurred and, therefore, the P.A. remains in escrow and unenforceable.

At pages 47–48 of its brief, defendant GCC elaborates an alternative theory of unenforceability, stating:

> RCI's reliance on the Payment Agreement is unwarranted not only because the Payment Agreement was placed in escrow and never became effective as was previously discussed; but, also because the Payment

---

**1.** As amended by Amendment # 01, executed on August 31, 1995.

Agreement was extracted from GCC through the employment of illegal economic duress that makes the payment agreement voidable.

GCC points to four instances which evidence RCI's illegal behavior: a) hiding from GCC huge cost overruns, thus depriving it of the option to abort the project in a timely manner, b) intentionally delaying completion of the work, c) inducing GCC to believe that it would negotiate new payment terms in good faith to make the project economically viable and d) suspending without warning work on the project.

Plaintiff, on the other hand, alleges that the P.A. came to fruition after months of extensive negotiations and that, once signed, according to its own terms, it became enforceable. However, as this took place during the Easter/Passover holiday weekend of 1996, it was agreed to place the just signed P.A. in escrow for a few days until GCC could deliver the initial $4.5 million payment required by it and provide the collateral documents for signature and recordation in the appropriate registry of deeds. As it turned out, these collateral documents were never perfected, and RCI insists that GCC's failure to do so, which It characterizes as an obligation under the P.A. and not a condition, could not relieve it now from complying with the terms of the P.A. as it suggests.

We review the relevant provisions of the P.A. before focusing on the legal principles applicable to this controversy. The introductory paragraph of this agreement states that GCC requested "that RCI provide deferred payment terms with respect to amounts owing for field services under the FSA, and RCI is willing to accommodate such request on the terms and conditions set forth herein." *See* paragraph 3 of the P.A. Section 1.3 of the Agreement provided that RCI would extend its service commitment under the FSA and the P.A. for GCC's account in excess of forty-seven million dollars for items essential to achieve start-up of the facilities. GCC agreed to pay for 50% of such additional services in cash, as provided in this section 1.3, and to provide assurance to RCI for payment of said amount by establishing a pre-funded RCI account with an initial deposit of 1 million dollars in favor of RCI to permit RCI to directly draw funds necessary to reimburse itself for 50% of such amount. Pursuant to that same section, the balance of the 50% of such additional services would be paid by GCC to RCI in full over time, in accordance with the other payment provisions contained in the P.A.

Section 2.1 of the P.A. is an acknowledgment of debt by GCC. In this section, GCC confirms that it had received RCI invoices for services, material and equipment furnished under the FSA in the sum of $38,767,-149. RCI represented that the invoiced and uninvoiced amount for work authorized by GCC under the FSA totaled the sum of $50,732,741.00 as of March 29, 1996.

Under section 2.1, GCC had the right to verify actual costs of materials and the right to verify that the materials and services billed to it on RCI invoices were actually provided to the facilities pursuant to the FSA. It acknowledged that the amounts billed were payable in full, subject to Its rights to audit which it agreed to exercise within ninety (90) calendar days following the mechanical completion date of the project.

Section 2.3 of the P.A. refers to the promissory notes which evidence the obligation of GCC to pay the outstanding amounts. Specifically, it refers to a non-negotiable promissory note of GCC in the amount of $38,767,-149.[2]

Section 3 of the P.A. sets forth the schedule of payments of the amounts owed by GCC. The agreement provided for the following Installments: 1) $4,500,000.00 upon execution of the P.A., 2) $666,667.00 on May 1, 1996 and on the first date of each calendar month thereafter thru September 1997 and $1,000,000.00 on October 1, 1997 and on the first day of each calendar month thereafter until full payment, 3) in addition to the above payments, $1,000,000.00 on November 1, 1997.

The P.A. provided under section 6 for collateral and guarantees to secure GCC's obligations under the P.A., the FSA and the

---

2. *See* Joint Exhibit I.

promissory notes. The third "whereas" of the P.A. mentions a group of companies collectively referred to as the "Gulf Parties" in the contract. It is there represented that Caribbean Chemical Corporation (CCC) is the owner of 100% of the issued and outstanding capital stock of GCC, and First Oil International, LTD (FOI) is the owner of 100% of the issued and outstanding capital stock of CCC. The "Gulf Parties" are identified as FOI, CCC, CPR and GCC.

Paragraph 10 of the P.A. provides:

REPRESENTATIONS AND WARRANTIES OF GCC. *In order to Induce RCI to enter into this Agreement,* GCC represents and warrants to RCI as of the date hereof as follows:

10.1  Organization and Authority. Each of GCC, CCC and first Oil is a corporation duly organized, validly existing and in good standing under the laws of the British Virgin Islands and has all corporate powers and all material government licenses, authorizations, consents and approvals required to enter into this Agreement and the other Gulf Party Documents and carry on its business as now conducted. CPR is a limited partnership validly existing and in good standing under the laws of the State of Delaware and has all partnership power and material government licenses, authorizations, consents and approvals required to enter Into the Gulf Party Documents to which It is a party and carry on its business as now conducted.

10.2  No Breach. The execution, delivery, and performance by each of GCC, CPR, CCC and first Oil of this Agreement and the other Gulf Party Documents are within its corporate or partnership powers (as applicable), have been duly authorized by all necessary corporate or partnership action (as applicable), require no action by or in respect of, or filing with, any governmental body, agency or official, (other than required filings and recordings in respect of mortgage and lien documents) and do not contravene, or constitute a default under its charter documents or by-laws or any material agreement, or any judgment, injunction, order, decree or other Instrument, in each case binding upon it, or

result in the creation or imposition of any lien, security interest or other charge or encumbrance on any of its assets, other than the Gulf Party Documents.

(Emphasis ours).

Section 6.1 of the P.A. provides that "GCC shall cause the Gulf parties and its other affiliates to deliver the following agreements . . . to secure GCC's obligations under this Agreement. . . ." What follows at section 6.1(a)(b)(c) and (d) is a detailed description of the guarantees that FOI, GCC and CPR, a GCC affiliate, will execute in favor of RCI as creditor. Pursuant to section 6.1(a), FOI will execute and deliver simultaneously with the execution and delivery of the P.A. a guarantee in the form of Exhibit C to the Agreement. The "whereas" clause refers to guarantor FOI and GCC as members of a group of related corporations, the success of any of which is dependent in part on the success of other members of such group and that "the guarantor wishes to guaranty the Company's [GCC] obligations to RCI under or in respect of the Payment Agreement and the F.S.A. . . ." The FOI guarantee document provides at section 2 that "this guaranty is an absolute and continuing guaranty of the full and punctual payment and performance of all of the Obligations and not of their collectibility only and is in no way conditioned upon any requirement that RCI first attempt to collect any of the Obligations from the Company or resort to any collateral security or other means of obtaining payment." Section 2 continues immediately thereafter stating that "[s]hould the Company default in the payment or performance of any of the Obligations, the obligations of the Guarantor herein under with respect to such Obligations in default shall become immediately due and payable to RCI, without demand or notice of any nature, all of which are expressly waived by the Guarantor." The guarantee provided by FOI limited its liability to the sum of $10,000,000.

Section 6.1(b) establishes that GCC would grant to RCI a first priority perfected mortgage lien on and security interest in the facilities at Peñuelas, P.R., and all of its other fixed assets. Section 6.1(c) provides that "GCC *shall cause* its affiliate Caribbean

Petroleum Refining L.P. (CPR), to grant to RCI first-priority perfected mortgage liens on (I) the land owned by CPR in Bayamón, Puerto Rico, together with the improvements and fixed assets located thereon consisting of a refinery (the '*Bayamón Collateral*'), and (ii) the land owned by CPR in Guaynabo, Puerto (sic), together with the improvements and fixed assets located thereon consisting of dock and terminal facilities and all rights associated with such land (the '*Guaynabo Collateral*'), in each case, subject to no other encumbrance other than Permitted Inferior Liens and other encumbrances acceptable to RCI; *provided* that the value of such mortgage liens shall be limited to US $85,000,000 in the aggregate."

The last guarantee provided to RCI appears at section 6.1(d) and consisted on a "second-priority perfected lien and security interest in all accounts receivable owing to GCC from CORCO, subject only to a first-priority lien and security interest in favor of GCC's working capital lender; provided, however that such lien and security Interest in favor of RCI shall become a first-priority lien and security interest on the date which Is the date of the first scheduled redemption of the Preferred Stock described in section 5 hereof."

Section 12.4(b), where the parties acknowledge the need to execute guarantees and other deeds subsequent to entering Into the P.A., includes a commitment to negotiate and prepare these in good faith.

RCI and GCC agree that any and all agreements, deeds, instruments, warrants and other documents to be executed and delivered pursuant to this Agreement on a date which is after the execution of this Agreement (including, without limitation, those agreements, deeds, instruments, warrants and documents described in section 3.1(ii), 3.3, 4.1(ii)(C), 4.1(111), 4.2, 6.1(a), 6.1(b), 6.2(b), 6.2(c) and 12.4. and any other agreement required by the terms of this Agreement to be in form and substance reasonably satisfactory to RCI) shall be prepared and negotiated by the parties in good faith and through fair dealing in order to effectuate the intent of this Agreement and shall be on terms reasonably satisfactory to all of the parties thereto.

Other relevant provisions of the P.A. are the following:

10.3 Enforceability. This Agreement and each of the other Gulf Party Documents when executed will be a legal valid and binding obligation of each of the Gulf Parties and Zeévi, enforceable against it in accordance with its terms, except as enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditor's rights and general principles of equity.

10.6 Disclosure. Except as otherwise disclosed in writing to RCI, there is no fact known to GCC which materially adversely affects the ability of the Gulf Parties or Zeévi to comply with the terms and conditions of this Agreement and the other Gulf Party Documents or to fulfill its obligations hereunder and thereunder.[3]

12.3 Entire Agreement. This Agreement (including the Exhibits hereto), together with the provisions of the FSA (including the Contract Documents as defined therein) not in conflict with the terms of this Agreement, (I) contains the entire understanding of the parties hereto and thereto (ii) supersedes all prior agreements, and (iii) shall not be amended except by a written instrument hereafter signed by all of the parties hereto or thereto, as applicable. No waiver of any provision of this Agreement shall be effective unless evidenced by a written instrument signed by the waiving party. GCC FURTHER ACKNOWLEDGES AND AGREES THAT, IN ENTERING INTO THIS AGREEMENT AND THE OTHER GULF PARTY DOCUMENTS, THEY HAVE NOT IN ANY WAY RELIED UPON ANY ORAL OR WRITTEN AGREEMENTS, STATEMENTS, PROMISES, INFORMATION, ARRANGEMENTS, UNDERSTANDINGS, REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, NOT SPECIFICALLY SET

**3.** The equivalent provisions related to RCI are sections 11.3 & 11.4.

FORTH IN THIS AGREEMENT, THE FSA OR THE OTHER GULF PARTY DOCUMENTS.

Based on this factual background of the contractual setting, we proceed to discuss the applicable legal principles surrounding the concept of obligation ("obligatio"). The original definition in Roman law of the obligation as a bond ("vinculum") has survived In Spanish and Puerto Rican civil law as the essential element of the contractual relationship. The obligation in the civil law is of a personal nature since it is the person, in this case the debtor, who, through his/its personal responsibility, is bound to comply with the contents of the obligation ("prestación"). L. Diez-Picasso, II *Fundamentos del Derecho Civil Patrimonial,* pp. 50–57 (1993).

■ In this case the contents of the obligation is patrimonial since GCC obligated itself to pay a debt for services and bound itself to secure its payment by executing certain collateral or guarantee documents. In this manner, the debtor tied its patrimony and that of its affiliates to the fulfillment of the obligations. The bonding and the tie are created solely by the expression of the debtor's will. If a party becomes bound it is because he/it has so willed it since the human will is considered the fulcrum of the obligation. We must, therefore, determine if the obligations contained in the P.A. are pure, without expression of limitations, or whether they are conditional. Alternatively, if the obligation is deemed to exist, we must then decide whether the bond ("vinculum") was dissolved because of a vitiated consent procured through fraud ("dolo in contrahendo").

■ Obligations are divided in three categories: pure, conditional and term. Pure are those which are demandable from the very moment In which the obligation is constituted and which are not subject to any circumstance that will limit Its effects. J. Puig-Brutau, I *Fundamentos de Derecho Civil 2,* p. 81 (1988). Conditional are those whose efficacy depends upon an uncertain event. These classifications are established in two statutory provisions of the Civil Code of Puerto Rico, to wit: Article 1066 (31 L.P.R.A. section 3041) and Article 1210 (31 L.P.R.A. section 3375). The latter provides:

"Contracts are perfected by mere consent and from that time they are binding." The former states that "[e]very obligation, the fulfillment of which should not depend upon a future or uncertain event or upon a past event, unknown to the parties in interest, shall be immediately demandable."

Since one of defendant's theories of non-enforceability of the P.A. Is anchored on the existence of a suspensive condition which never occurred, we shall review the concept of the conditional obligation.

Article 1067 of the Puerto Rico Civil Code, 31 L.P.R.A. section 3042, establishes that: "In conditional obligations, the acquisition of rights, as well as the extinction of those already acquired, shall depend upon the event constituting the condition." The event constituting the condition which this article addresses is that "*future or uncertain event*" referred to in Article 1066, where the Code pits the pure obligation against the conditional one.

The insertion of a condition as an element of the obligation is a means of limiting the will of the parties. As pointed out by Diez-Picasso, *supra,* at pp. 348–49, the condition is a self-imposed limitation which places the contractual relationship in a phase of suspension ("fase de pendencia"). In other words, it is not until the condition appears and is fulfilled that the obligation comes to life. Such is the will of the parties who define, in part or in whole, their contractual activity subject to a condition (conditions). The condition therefore entails a necessary delay during which the acquisition of rights contemplated by the parties in their obligational structure is held in abeyance until the same is fulfilled. Diez-Picasso discusses the functions of the condition in relation to the development, the efficacy and the binding capacity of the obligational structure in the following manner:

> The doctrine has considered the condition as a self-imposed limitation of the will introduced in the declaration of the will. It is understood that it is the will itself, through the conditions, which imposes its own limitations. It has been said that the declaration of the will is a declaration en-

dowed with special qualities. The special nature consists in a weakening of its intensity and Its strength, in such a manner that it has no productive efficacy by itself, unless tied to certain external circumstances.

Diez–Picasso, *supra*, p. 348 (translation ours).

As defined by the statute, the condition must be a "future or uncertain" event. Uncertainty is a characteristic of the condition. Luis Diez–Picasso, Antonio Gullón, *Instituciones de Derecho Civil*, p. 503 (1995). it is precisely this uncertainty, not knowing whether the event will occur or not, injected into the contractual relationship by the parties themselves, which confines their own will.

The following examples provide a clear understanding of the conditional obligation. In *Mercedes Bus Line, Inc. v. Rojas*, 70 P.R.R. 519, the Supreme Court of Puerto Rico, on reconsideration, concluded that a contract by virtue of which the defendant agreed to purchase from the bus line a number of buses with the corresponding franchise or permits issued for public service was subject to a suspensive condition "as its effectiveness depends on the favorable action of the Public Service Commission." *Id.*, at p. 520. Diez–Picasso gives the following examples:

1) if a sale of a lot depends upon the issuance of a construction permit, the sale is not deemed to exist until the authorization is obtained.

2) the parties agreed that the sale of a racehorse is conditioned to its winning the next big award.

3) the establishment of a partnership is conditioned upon the registration of a trademark.

4) an architect's fees is conditioned upon the finished project receiving the use permit from a municipality.

The element of uncertainty which is the defining characteristic of a condition is obvious in each of these examples. When the parties enter into conditional obligations, they impose limitations, as a declaration of their own will. This is a scenario which is totally different from that claimed by defendant in this case. The execution of the collateral documents (mortgage deeds) which followed the signing of the contract was *simply a security to the creditor in the event of default in payment by debtor and not a condition whose uncertain realization could render the payment obligation without efficacy.*

■ Defendant contends that there are two suspensive conditions to the P.A. and that these conditions were established in the two letters of April 5 and April 6, 1996 [4] which have been referred to as the Escrow Agreement (Exhibits 1 and 2 for defendant). The first of these conditions is identified by defendant as the $4.5 million payment which was due upon execution of the Agreement. *See* P.A. at section 3.1(I). Since the $4.5 million payment was made, defendant focus on that which they have classified as the second suspensive condition which makes the payment contract unenforceable; to wit, the execution of the guarantees or the collateral documents. Indeed, the attorneys for the parties, subsequent to their clients having signed the P.A. after months of negotiation, sent two letters in which they arranged to hold the contract documents in escrow until the $4.5 million payment, one of multiple installments which defendant had to meet, and the collateral documents were executed. The evidence undisputedly shows that this was a practical arrangement set up by the attorneys who were faced, after the contract was signed by their clients, with an extended religious holiday both in Puerto Rico and in Israel. Due to this, banks were closed. The attorneys also confronted at the time the situation that the guarantees, which defendant had obliged itself to execute at section 6 of the contract, had yet to be prepared before the notaries. All of this required additional time.

---

**4.** The parties stipulated that although this letter appears dated March 6, 1996, the correct date is April 6, 1996.

The fact that the signatories to the contract knew of the attorneys' arrangement and that the attorneys referred to it in later correspondence, does not alter the legal conclusion that neither the $4.5 million payment nor the execution of the guarantees or collateral documents were suspensive conditions which made the contract inexistent if they did not come to pass. There is nothing in the contract which even Insinuates that if the parties ran into difficulties resulting in the negotiations of the collateral documents reaching an impasse,[5] the consequence was that debtor's obligation to pay and creditor's right to claim payment vanished as inexistent. However, if it were confronted with a breach of contract claim by the creditor, based on the alleged failure of the Gulf Parties to create the first priority liens and the failure to deliver the other collateral documents agreed to at paragraph 6 of the P.A., defendant-debtor could legitimately oppose the contention that any one of the specific documents described therein which was not executed was due to a lack of the fair dealing and the good faith negotiation, on the part of the creditor, which was required in section 12.4(b) of the P.A. Such a defense would stem from the existence of the contractual relationship between the parties, as defined by the terms of their P.A. It could not arise, given the structure of the obligations spelled out in the P.A., from the alleged inexistence or unenforceability of that contract because of an unfulfilled suspensive condition.

The Escrow Agreement, in which the two suspensive conditions which allegedly modified or amended the original agreement are contained, is not a written instrument, as repeatedly claimed, that either waives or modifies the original agreement. Neither do the two events classified as suspensive conditions comply with the requirements of the suspensive conditions, as that concept is defined in the Civil Code and explained by the commentators. The element of uncertainty which characterizes the condition is absent in the two events that defendant classified as such. In fact, these two events, the $4.5 million payment and the execution of the

collateral documents, both point to events of default within the terms of the P.A. in case of non-compliance. Event of default is defined in paragraph 7(b) of the P.A. whose relevant portion follows:

For purposes of this Agreement, "Event of default" shall mean the occurrence of any of the following events, subject to the provisions of section 7© hereof: (I) failure to pay on time any amount due from GCC to RCI as described in this Agreement, the FSA, the Promissory Notes, the Preferred Stock (when and after issued) or any other Gulf Party Document when due ... (ii) failure of any Gulf Party to perform any other obligation under this Agreement, the FSA, the Promissory Notes or the Preferred Stock (when and after issued) or any other Gulf Party Document when required or failure by Zeévi to perform any obligations under the Zeévi Guaranty when required; (iii) the occurrence of any default under any other Gulf Party Document or the Zeévi Guaranty; (iv) Zeévi shall at any time, cease to own, legally or beneficially, capital stock of First Oil, CCC or GCC which has at least 51% of the total voting rights of each of such corporations; (v) any representation or warranty contained in this Agreement or any other Gulf Party Document or the Zeévi Guaranty shall prove to have been false in any material respect when made; or (vi) any bankruptcy, liquidation, receivership, insolvency or similar event with respect to any Gulf Party or their respective subsidiaries or Zeévi; provided, however, that until the Mechanical Completion Date, "Event of Default" shall mean only the occurrence of either (x) any event described in section 7(b)(1) above or (y) any bankruptcy, liquidation, receivership, insolvency or similar event with respect to First Oil or any direct or indirect subsidiary of First Oil.

It is clear from that contractual provision, as well as the provision set forth in section 7(c), that the failure to make timely payment, if not cured within five business days of the due date, placed GCC in default. The failure

---

**5.** Paragraph 12.4(b) of the contract required the parties to engage in a good faith negotiation and fair dealing in the preparation and execution of

the collateral documents listed at paragraph 6 as guarantees.

to perform any non-payment obligation under the P.A., which according to section 7(b) included defendant's obligation to provide adequate security, if not cured within the period specified in section 7(c), also placed GCC in default after the Mechanical Completion Date. Pursuant to section 7(a), upon the occurrence of an event of default of the type set forth in section 7(b) or as set forth in any Gulf Party Document or the Zeévi Guarantee, all amounts outstanding under the P.A. became "immediately due and payable without notice or presentment ..." and "RCI shall be entitled to proceed against any or all of the collateral security pursuant to the terms thereof." A reading of sections 6, 7 and 10 in their entirety leads to the inescapable conclusion that the collateral security was an integral part of the agreement between the parties, and that there was no uncertainty as to debtors' obligation to provide the same and the creditors' entitlement to proceed against it in the event of default in payment or if debtor failed to perform any non-payment obligation under the contract. GCC could not, under the contract, elect whether or not to provide the collateral security. It had no choice and the failure to execute the collateral security that it bound Itself to provide in section 6 would result, sooner or later, in a finding of default by the creditor, pursuant to the contract.

The escrow arrangement set up by the attorneys for the contracting parties, when faced with an extended holiday after the signing of the contract and with unfinished collateral documents which required further negotiation, is not the "written instrument hereinafter signed by *all of the parties*" which paragraph 1.3 establishes as the *only* method of amending the P.A. Nor is it a waiver of the entire P.A. or portions thereof since the parties specifically stated at that same paragraph 12.3 that "[n]o waiver of *any* provision of this Agreement shall be effective unless evidenced by a written Instrument signed *by the waiving party*." The two letters presented by defendant which constitute the Escrow Agreement are signed only by attorneys, not by the parties. Faced with the undeniable fact that there is no written instrument signed by the parties which either modifies or waives the P.A., defendant

GCC has resorted to interpretations of what the *attorneys'* intentions were in placing the document in escrow. Defendant, through the extensive presentation of testimonial evidence of the attorneys, attempt not only to abolish the express method of amendment and waiver of the provisions of the P.A. established by the parties in section 12.3, but go further by subjecting the efficacy of the *entire* P.A. to the two events ($4.5 million payment/collateral security) mentioned by the attorneys in the two letters referred to as the Escrow Agreement. By doing this, they attempt to catapult the declaration of the parties' will, stated in unambiguous terms in the P.A., into a totally different contractual relationship.

The Court is compelled to conclude, in light of the text of the contract and of the evidence before it, that the contractual obligations which are the object of this lawsuit are not conditional, but rather guaranteed obligations. The contract specifically states at paragraph 10 that plaintiff-creditor entered Into the P.A. induced by the obligations assumed by debtor and its affiliates to execute the mortgage deeds and other security documents. These are very specific guarantees where each affiliate company provides security. The contractual language clearly established that the debtor guaranteed payment and the creditor demanded security through the specific guarantees detailed at section 6.

Pursuant to the expression of their will, the parties stipulated the personal and real guarantees which they deemed sufficient. In this manner, they went beyond the universal and general guarantee established by the Civil Code in its Article 1811, 31 L.P.R.A. section 5171, which provides that "[a] debtor is liable for the fulfillment of his obligation with all his present and future property." As García–Amigo points out, the universal guarantee which affects all of the debtor's estate varies during the entire period in which the debt is outstanding since the debtor continues to own the properties and can therefore dispose of them or acquire new debts. M. García–Amigo, *Teoría General de las Obligaciones y Contratos*, p. 516 (1995). When the contracting parties, however,

choose to require and to offer specific liens over real property, such as the mortgage liens provided for in section 6 of the P.A., the lien follows the property and provides greater security than that afforded by Article 1811. The creditor protects his credit by binding, through the contractual provisions, the debtor's estate and that of its affiliates in the amounts of the liens, at any time, in the event of default. The security thus provided constitutes an integral part of the obligation to pay and of the right to claim payment through foreclosure of the mortgaged properties.

■ Having concluded that the P.A. was not subjected to the two suspensive conditions allegedly incorporated by the Escrow Agreement, and that it is currently in effect, we must address GCC's alternative theory of unenforceability: whether the P.A. was obtained through the employment of illegal economic duress and, as such, is voidable. This theory is centered on Article 1217 of the Civil Code, 31 L.P.R.A. section 3404, which provides that any contract where the consent of the parties is given by deceit ("dolo") shall be void. The Code goes on to specify, in its Article 1221, 31 L.P.R.A. section 3408, that "[t]here is deceit when by words or insidious machinations on the part of one of the contracting parties the other is induced to execute a contract which without them he would not have made." It later clarifies, however, that "[i]n order that deceit may give rise to the nullity of a contract, it must be serious, and must not have been employed by both of the contracting parties." Article 1222, 31 L.P.R.A. section 3409. What the Code calls "incidental" deceit only renders the party who employed it liable to indemnify for losses and damages. *Id.*

■ In order to prove deceit, the intentional fault or bad faith of the person charged must be established, inasmuch as good faith is always presumed. *Citibank v. Dependable Ins. Co., Inc.,* 121 D.P.R. 503, 519 (1988). A person's education, his social and economic status, his relations, and the type of business in which he is engaged are significant when trying to determine the existence of "dolus" that would void his consent. *Id.*

After carefully reviewing all the evidence presented before the Court as to this issue, we find that at this stage of the proceedings, under the relevant standard of likelihood of success, the theory of deceit ("dolo") is simply not applicable. Quite the contrary, the evidence tends to indicate that the incidents raised by defendant in support of their claim of deceit (e.g. delays In the completion of the work, costs overruns) were amply discussed by the parties, represented by counsel, during the extensive process of negotiation of the P.A. Accordingly, defendant's alternative theory of unenforceability of the P.A. also fails.

In sum, being the P.A. a valid and enforceable contract, we find that the order for provisional remedies to secure satisfaction of judgment issued on May 3, 1996 was properly entered. Rule 56.1 of the Puerto Rico Rules of Civil Procedure.

For the reasons stated above, defendants GCC and FOI's Urgent Motion to Set Aside the Ex-parte Order (docket entry 7) was denied by Order entered on February 27, 1997 (docket entry 137).

SO ORDERED.