**WHTV BROADCASTING CORP.,**
**et al., Plaintiffs**

**v.**

**CENTENNIAL COMMUNICATIONS**
**CORP., et al., Defendants.**

**Civil No. 02–1388(SEC).**

United States District Court,
D. Puerto Rico.

Oct. 30, 2006.

Jaime Sifre–Rodriguez, Hector E. Valdes–Ortiz, Sanchez Betances & Sifre, P.S.C., San Juan, PR, for Plaintiffs.

Ramon E. Davila–Carlos, Raul Davila–Rivera, Davila & Davila, San Juan, PR, for Defendants.

## OPINION AND ORDER

CASELLAS, Senior District Judge.

Before the Court is Defendants' motion for summary judgment (Docket # 92).

Plaintiffs filed an opposition (Docket # 97) and Defendants replied (Dockets ## 108 & 110). After reviewing the parties' filings, the evidence in the record, and the applicable law, Defendants' motion will be **GRANTED in part and DENIED in part.**

**Factual Background**

Plaintiffs in this case are WHTV Broadcasting Corp. (hereinafter "WHTV") and Sala Foundation, Inc. (herein "Sala"). WHTV is a company which owns and operates a wireless cable system encompassing a 35 mile radius from Aguas Buenas through the use of leased MMDS, ITFS and OFS channels. Docket # 1 ¶ 6. Sala is a non-profit corporation which holds the MMDS F Band Channel licenses as well as the OFS channel H–1, H2 and H–3 licenses. Docket # 1 ¶ 7. Defendants are Centennial Communications Corp. and Centennial Operating Co., LLC (collectively referred to hereinafter as "Centennial"), engaged in the business of wireless communications services.

This is a diversity action stemming from the negotiation between the parties for the sale and acquisition of all of Sala's assets along with the licenses held by them, and all of the issued and outstanding common stock of WHTV. Generally, Plaintiffs claim that upon the execution of a Letter Agreement (hereinafter the Agreement) on November 29, 2000, Defendants agreed, *inter alia,* to acquire the aforementioned assets and negotiate in good faith and execute a definitive agreement to this end within 45 days from the day the Agreement was signed by the parties. This Agreement was extended *sine die* by mutual consent of the parties on January 2001. However, on April 24, 2001, Centennial informed Plaintiffs that it did not wish to proceed with the transaction and, instead, intended to terminate the Letter Agreement. There followed the instant suit, where Plaintiffs claim relief for breach of contract under Puerto Rico law seeking specific performance of the obligations under the Agreement and contractual damages, or, alternatively, damages under Article 1802 of the Puerto Rico Civil Code.

After reviewing Defendants' statement of uncontested facts, Plaintiffs' oppositions thereto and Defendants' reply, the Court notes that the following material facts are uncontested. The Court has listed these facts, to the best of its ability, in chronological order in order to obtain a better understanding of the negotiations, transactions, and conduct of the parties.

1. WHTV owns and operates a wireless cable system encompassing a 35–mile radius through the use of leased channels. The leased channels are MMDS, ITFS and OFS channels (the "Wireless Cable System"). At least some of these channels are leased from Sala among other lessors. Docket # 92 SUF No. 1.

2. Sala holds the MMDS F Band channel licenses, the OFS channel H–1 license, the OFS channel H–2 license and OFS channel H–3 license. This Wireless Cable System served, for the period in question, approximately 5,800 subscribers. All licenses are issued by the FCC. Docket # 92 SUF No. 2.

3. On, or around, March of 2000, WHTV and Sala commenced negotiations with Centennial, for the proposed purchase by Centennial of WHTV's Wireless Cable System, the Licenses and the assets of WHTV (the "Business"). Docket # 92 SUF No. 3.

4. Centennial was interested in the Business and the MMDS technology as a *last mile solution.* Docket # 99 SUF No. 1.

5. The *last mile* is the point of interconnection between a network that reaches a customer. It is important because it gives Centennial the ability to reach customers. Docket # 99 SUF No. 2.

6. Centennial had identified MMDS as a possible *last mile solution* before it began negotiating with WHTV and Sala. Docket # 99 SUF No. 3.

7. On March 10, 2000, the parties signed a Non–Disclosure Agreement to exchange information concerning Plaintiffs' business assets, and "to protect any information disclosed between them pertaining [to] a[sic] possible deal for the acquisition" of the Business. Docket # 92 SUF No. 4.

8. Centennial began its due diligence of WHTV and Sala during the summer of 2000 by looking into MMDS technology. This began with Pedro Rivera, Centennial Radio Frequency Engineer, and Miguel Torres, Centennial's Finance Manager, attending the Wireless Cable Associate Conference in New Orleans on July, 2000. Docket # 99 SUF No. 5.

9. On July 24, 2000, Jose Sala, WHTV's General Manager and Sala Director, informed Carlos Bofill, Centennial Caribbean Operations' Chief Executive Officer, Kari Jordan, Centennial's General Manager, and Richard Gasink, Centennial Caribbean Operations' Chief Financial Officer, which licenses WHTV and Sala used to operate the business. Mr. Sala also sent Messrs. Bofill, Jordan and Gasink copies of at least some of the Licenses and/or lease agreements. Docket # 92 SUF No. 5 & Docket # 99 SUF No. 7.

10. Centennial became aware in June, July and August 2000, as it developed its business plan to acquire the Business, that most of the licenses WHTV and Sala used to operate the Business were leased from third parties. Docket # 99 SUF No. 10.

11. Centennial knew that it would need to acquire the MDS licenses for San Juan in order to operate the data network using MMDS technology. These licenses were held by John Jung and are referred to as the "BTA.". Docket # 99 SUF No. 12.

12. WHTV and Sala did not possess nor control the licenses owned by the Ana G. Méndez Foundation. Docket # 99 SUF No. 13.

13. On, or around, August of 2000, the parties commenced negotiations for the execution of a Letter of Intent (the Agreement) to set the rules and conditions for the proposed transaction, including the future execution of a "Definitive Agreement" between the parties. Docket # 92 SUF No. 6 & Docket # 99 SUF No. 16.

14. The parties met on September 14, 2000 in Washington D.C., with their respective FCC counsel, to identify the issues surrounding the transaction. Docket # 99 SUF No. 18.

15. During the September 14 meeting the parties identified that the FCC would have to grant the following approvals to complete the transaction: (a) a determination that Teleponce's cable system was subject to effective competition; (b) approval of the transfer of Sala's licenses to Centennial; (c) approval of the transfer of the BTA from Jung to Sala or Centennial; (d) approval of Centennial's cross-ownership of both Teleponce and the MDS Licenses it would purchase from Jung; (e) approval of Centennial's cross-leasing of both Teleponce and ITFS licenses WHTV leased from third parties other than Sala. Docket # 99 SUF No. 21.

16. After the September 14 meeting, WHTV and Sala started negotiating in earnest with Jung to acquire the BTA on behalf of Centennial. Docket # 99 SUF No. 24.

17. After discussing several drafts, the parties signed the Agreement on November 29, 2000. Docket # 99 SUF No. 25.

18. Section 1(e) of the Agreement provides that Centennial had conducted limited due diligence of the Business. Docket # 92 SUF No. 8.

19. The transaction at issue *was subject to the conditions* contained in the Agreement including Centennial's satisfaction with its due diligence. Docket # 92 SUF No. 9.

20. The parties agreed to negotiate in good faith a Definitive Agreement containing the terms consistent with the Agreement and, without limitation, additional terms and conditions. Docket # 92 SUF No. 10.

21. The obligation of Centennial to complete the Closing (i.e. purchase of the Business) was conditioned, without limitation, to the fulfillment of the conditions listed therein. Docket # 92 SUF No. 11.

22. The purchase price of the Business as contained in the Agreement was going to be $30 million dollars, subject to some adjustments to be mutually agreed upon by the parties. Docket # 99 SUF No. 17 & Docket # 110 SUF No. 17.

23. The parties agreed to consummate the transactions contemplated in the Agreement (subject to the conditions set forth in the same), and to execute the Definitive Agreement with approval by Sala, WHTV and Centennial Board of Directors, respectively, no later than 45 days from the date of the Agreement (the "Execution Deadline"). In January 2000, the Execution Deadline was extended *sine die* by mutual agreement of the parties. Docket # 92 SUF No. 13 & Docket # 99 SUF No. 25.

24. Section 11 of the Agreement states in pertinent part: "Binding Effect. This letter agreement is intended to be a binding agreement between the parties hereto, subject only to the conditions set forth herein, and will inure to the benefit of their successors and assigns." Docket # 92 SUF No. 14.

25. The parties expressly agreed that "Centennial may terminate this letter agreement if Centennial's due diligence investigation contemplated hereby is not reasonably satisfactory to Centennial." Docket # 92 SUF No. 15.

26. Upon execution of the Agreement, Centennial conducted a due diligence investigation of Plaintiffs' Business that included, among others, the financial, accounting, regulatory, legal and technological aspects of the Business and the possible transaction. Docket # 92 SUF No. 16.

27. The parties agreed that the Agreement "will be governed and construed in accordance with the internal laws of the Commonwealth of Puerto Rico." Docket # 92 SUF No. 19.

28. WHTV and Sala kept Centennial informed of the developments in the BTA negotiations throughout the December 2001–April 2001 period, including the escalating price of the acquisition. Docket # 99 SUF No. 26.

29. Centennial authorized WHTV and Sala to offer Jung $1.5 million dollars for the BTA. Docket # 99 SUF No. 27.

30. On January 25, 2001, the parties met at the Intercontinental Hotel to discuss due diligence for the Centennial/WHTV Sala transaction. Docket # 99 SUF No. 28.

31. Mr. Torres met with Miguel Rodríguez, WHTV's Comptroller, on February 13, 2001 to discuss certain issues that Centennial had identified as part of the financial due diligence. Mr. Rodríguez provided Mr. Torres with a report on the issues the latter identified, and they discussed the same during the meeting. Centennial did not request additional financial due diligence information after the February 13 meeting. By

then, WHTV and Sala had produced all pertinent financial due diligence information to Centennial. Docket # 99 SUF No. 29.

32. On March 16, 2001, WHTV and Sala asked Centennial in writing to confirm their interest in acquiring the Business. After receiving this request, Centennial continued the negotiations with WHTV and Sala. Docket # 99 SUF No. 32.

33. On March 29, 2001, the parties agreed to have Jorge P. Sala, WHTV and Sala's attorney, draft the Definitive Agreement on behalf of WHTV and Sala. Docket # 99 SUF NO. 34.

34. On April 24, 2001, Centennial informed WHTV and Sala that it would not go ahead with the acquisition of the Business. Docket # 99 SUF No. 36.

35. On April 25, 2001, WHTV and Sala's attorney informed Centennial that the FCC was proposing an extension of the build out period for the BTA. Docket # 99 SUF No. 37.

36. WHTV and Sala kept Centennial informed of the developments in the BTA negotiation throughout the December 2001–April 2001 period, including the escalating price. Centennial sent communications to WHTV approving the modified price for the transaction. Docket # 99 SUF No. 26.

**Standard of Review**

FED.R.CIV.P. 56(b) provides that: "A party against whom a claim ... is asserted ... may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part [of the claims asserted against him/her]." The Court may grant the movant's motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any materi-

al fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *See also, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202(1986); *NASCO, Inc. v. Pub. Storage, Inc.,* 29 F.3d 28 (1st Cir.1994). "The principal judicial inquiry required by Rule 56 is whether a genuine issue of material fact exists." WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2725 (3d. ed.1998).

When determining whether to grant summary judgment, the Court may not weigh the evidence. *Casas Office Machs., Inc. v. Mita Copystar Am., Inc.,* 42 F.3d 668, 684 (1st Cir.1994). Summary judgment "admits of no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails." *Id.* (*citing Greenburg v. P.R. Mar. Shipping Auth.,* 835 F.2d 932, 936 (1st Cir.1987)). Accordingly, if the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the non-moving party. *Casas Office Machs.,* 42 F.3d at 684.

While the moving party has the burden of initially establishing that there is "an absence of evidence to support the nonmoving party's case," *Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 581 (1st Cir.1994); the nonmovant has a "corresponding obligation to offer the court more than steamy rhetoric and bare conclusions." *Lawton v. State Mut. Life Assurance Co. of Am.,* 101 F.3d 218, 223 (1st Cir.1996). Furthermore, "the nonmovant must 'produce specific facts, in suitable evidentiary form' sufficient to limn a trial-worthy issue.... Failure to do so allows the summary judgment engine to operate at full throttle." *Id.; see also, Kelly v. United States,* 924 F.2d 355, 358 (1st Cir. 1991) (warning that "the decision to sit idly

by and allow the summary judgment proponent to configure the record is likely to prove fraught with consequence."); *Medina Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990) (*quoting Mack v. Great Atl. & Pac. Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989)) (holding that "[t]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve.").

### Applicable Law and Analysis

Defendants request the entry of summary judgment as to both counts alleged in the complaint. As to the breach of contract claim, Defendants aver that since the Agreement contains several conditions precedent (in Spanish, "condiciones suspensivas"), it cannot be considered as a binding contract for the acquisition of the Business but merely a pre-contract to negotiate further. They further aver that given the existence of these conditions precedent, the essential element of consent is not present in order to have a binding contract under Puerto Rico law, until these conditions are met. In any event, Defendants further propose these conditions precedent were not met and, therefore, the Agreement never became ripe and they could validly terminate their negotiations under the terms of the Agreement. To this end, they also argue that Plaintiffs' claim for damages under Art. 1802 should be dismissed as they have provided sufficient evidence to establish, as a matter of law, that they negotiated at all times in good faith and by employing reasonable commercial efforts.

Plaintiffs do not contest the fact that the Agreement signed by the parties on November 29, 2000 was subject to a series of conditions, and was not effective until these were met. Nevertheless, they argue that Art. 1072 of the Puerto Rico Civil Code applies in the case at bar because

Defendants voluntarily prevented the conditions from being fulfilled. This article prays that "the condition shall be considered fulfilled when the obligated party should voluntarily prevent its fulfillment." 31 P.R. Laws Ann. § 1213. As an alternative argument, Plaintiffs aver that even if this Court finds that conditions precedent were not met without Defendants' fault, an extra-contractual claim is available to them under the *culpa in contrahendo doctrine,* arising from Art.1802 of the Civil Code.

Under Puerto Rico law, there is no contract unless the following three elements are present: (1) the consent of the contracting parties; (2) a definitive object subject of the contract; and (3) a cause for the obligations that each party is assuming. 31 P.R. Laws Ann. § 1213. There is consent upon the concurrence of the offer and the acceptance of the thing (object) and the cause which are to constitute the contract. 31 P.R. Laws Ann. § 3401. A party is free to condition its consent to a particular obligation by inserting into a contract a condition precedent. "In conditional obligations, the acquisition of rights, as well as the extinction or loss of those already acquired, shall depend upon the event constituting the condition." 31 P.R. Laws Ann. § 3042. Therefore, an obligation subject to a condition precedent binds the parties to the contract but " 'they must wait until the uncertainty disappears ... Therefore, even when the parties are bound to each other, it is not known with certainty whether the obligation will become effective' ... If the condition precedent is met, the obligation is born ... if ... it does not, the lawful binding between the parties is never born." *Melendez Martinez v. Jimenez Realty,* Inc. 98 D.P.R. 892, 897 (1970)(our translation); *see also, Satellite Broadcasting Cable, Inc. v. Telefonica De Espana, S.A.,* 786 F.Supp. 1089, 1095 (D.P.R.1992).

In other words, "the insertion of a condition is a **self-imposed limitation** which places the contractual relationship **in a phase of suspension** ... [t]he condition therefore entails a necessary delay during which the acquisition of rights contemplated by the parties in their obligational structure ... is held in abeyance until the same is fulfilled." *Raytheon–Catalytic, Inc. v. Gulf Chemical Corporation,* 959 F.Supp. 100 (D.P.R.1997)(our emphasis). In the words of the Supreme Court of Puerto Rico, "while the condition precedent is pending it can be said that the obligation does not exist." *Melendez Martinez,* 98 D.P.R. at 898. (our translation).

▇▇▇ Furthermore, there is a difference between a fully enforceable contract subject to conditions precedent, and a preliminary contract subject to such conditions, the latter being a "means to a contract rather than its end." *Prime Retail, L.P. v. Caribbean Airport Facilities, Inc.,* 975 F.Supp. 148 (D.P.R.1997). In a preliminary contract the parties "do not bind themselves to conclude the deal but only to negotiate in good faith toward conclusion within the agreed framework." *Id.* at 151. Furthermore, it has been established that "a memorandum with open terms that make reference to a future contract is not an enforceable contract" *Id., quoting, Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 72 (2d. Cir.1989).

▇▇▇ The Agreement executed by the parties in the case at bar has language that frames it as a preliminary contract. The pertinent parts of the agreement provide that: "[i]mmediately after the execution of this letter, the Sellers and Centennial **will negotiate in good faith a definitive agreement(s)** ("Definitive Agreement"), containing terms consistent with the terms of this letter, **and other customary and mutually agreeable covenants, representations and warranties, indemnities, closing conditions and other terms customary in transactions of this nature."** *See,* Defendants' Exhibit No. 4, p. 3, Docket # 92.(our emphasis). The Agreement also provides that "[t]he Purchase Price **will be adjusted** (up or down as applicable) by an amount **to be agreed upon by Centennial and Sala** to reflect the net change in subscribers from the date of signing a Definitive Agreement to the Closing Date." *Id.,* p. 2.(our emphasis). Therefore, the object of this contract was not the purchase by the Defendants of WHTV's stock and Sala's assets, but the promise to negotiate in good faith a Definitive Agreement of such purchase. It was a preliminary contract in which "the parties recognize[d] the existence of open terms, even major ones, but having agreed on certain important terms, agree[d] to bind themselves to negotiate in good faith to work out the terms remaining open." *Prime Retail,* 975 F.Supp. at 151.

The record shows that the Defendants intended this contract to be a preliminary one because the transaction was seen as an opportunity to develop a *last mile solution* (the point of interconnection between a specific network and a customer) but only a potential one, since the technology needed to develop it was not available at the time the parties signed the contract. In order to determine if Defendants breached the contract, as argued by Plaintiffs, it is necessary to first ascertain if the conditions precedent contained in the Letter Agreement were in fact satisfied, which would render the contract effective; or in the event these were still pending, if it was Defendants' voluntary conduct, intentional, or negligent, which prevented their fulfillment.

▇▇▇ It is undisputed that the Agreement contained a number of conditions precedent that needed to be fulfilled completely or either party could rightfully withdraw from the Agreement. It condi-

tioned the execution of the contract to **"Centennial's satisfaction with its due diligence"**, Defendants' Exhibit No. 4, Docket # 92 (our emphasis), and included a clause that allowed the termination of the contract by Defendants if not satisfied with the due diligence process, the effect being the same: that Defendants could rightfully retract from the transaction if this condition was not met. The Agreement did not, on the other hand, specify the factors that Centennial could take into consideration to determine whether they were satisfied with the due diligence, it only stated that said factors needed to be reasonable. Defendants point out a number of reasons why the due diligence of Plaintiffs' business was not satisfactory to them. The main reasons relate to the financial problems that WHTV was going through, which turned out to be greater than expected before entering the Agreement, and the fact that the technology developed was not adequate to render the transaction viable for the Defendants. The record shows that the CPA hired by the Defendants to look into WHTV's business, as part of their due diligence, found significant inconsistencies in the numbers provided by WHTV to Defendants in terms of the revenues, expenses and liabilities. The CPA's findings included deferral of expenses, improper recognition of revenues and unrecorded tax liabilities. *See,* Docket # 92, Ex. 11, p. 30 & Exhibit 5 & 33 of such Deposition; Ex. 7, pp. 111–112, Ex. 13 at p. 44; Memo dated 2/20/01 by Miguel Torres–Docket # 99, Ex. 1.

To contradict this evidence Plaintiffs only argue that "Centennial was aware of WHTV's less than stellar performance long before it agreed to acquire the latter." *See,* Docket 99, p. 14. This evidence, on the other hand, does not negate the fact, supported by the record, that the financial numbers, provided by Plaintiffs to Defendants before the Agreement was signed, were not accurate. There is also evidence

that the technology (or equipment) needed for Centennial to exploit the licenses in question was not viable (Docket # 92, Ex. 6 at pp. 32–33, 44; Ex. 10 at pp. 16, 20; Ex. 13 at p. 52, 55); that they had reasonable reason to believe **prior to its decision to terminate the Agreement** that the FCC could reallocate the MDS/ITFS spectrum for 3G use (Docket # 92, Ex. 13 at pp. 39, 44 & Ex. 15 at p. 43); and that it was reasonable for Centennial to believe **prior to its decision to terminate the Agreement** that the BTA license transaction would not be completed in time to build the needed facilities prior to the built-out deadline imposed by the FCC, and, therefore, the purchase of the BTA licenses would be subject to a contingency out of the parties' hands (Docket # 92, Ex. 15 at p. 47). This evidence has not been properly controverted by the plaintiffs.

Faced with this uncontroverted evidence, the contentions presented by the Plaintiffs in their Opposition, that Defendants voluntarily impeded the conditions precedent from being met are just unsupported allegations that cannot keep the breach of contract claim alive. The record shows sufficient reasonable reasons why Defendants could rightfully withdraw from the transaction.

On the other hand, Plaintiffs second claim is based in the doctrine of *culpa in contrahendo* under Art. 1802 of the Puerto Rico Civil Code. This doctrine has been applied to the preliminary dealings between parties to a contract and require that they act in good faith during this phase. *See, Colon v. Glamorous Nails & Boutique, Inc.,* 2006 WL 345008, 2006 TSPR 16 (2006); *see also, Tommy Muniz v. Copan,* 1982 WL 210537, 113 D.P.R. 517 (1982). The doctrine was developed because "[i]t is a basic principle of obligational law that nobody can be forced to enter into a contract." *Glamorous Nails,* 2006 WL 345008, *3, 2006 T.S.P.R. 16 (our

translation). It recognizes that "preliminary dealings generate a relationship, social in nature, that imposes upon the parties the duty to act in good faith...." *Id.,* at 2006 WL 345008, *4. Although in these cases there was no agreement that governed the pre-contractual dealings between the parties, like the one in the case at bar, the doctrine has also been applied to cases in which the parties have negotiated a preliminary contract. In *Satellite* the court concluded that "[b]ecause no ... contract exist[ed] until a condition precedent [was] complied with, the negotiations were, at all relevant times, pre-contractual in nature and subject to a duty of good faith...." *Satellite,* 786 F.Supp. at 1095. *See also, Prime Retail,* 975 F.Supp. at 152 (concluding that "although the instant contract was a preliminary promise to contract, duties still attach to both parties to engage in the pursuit of the contract in good faith.") Moreover, in this case the parties explicitly included such a duty as a clause to their Agreement. Docket # 92, Ex. 4, ¶ 3 & 4.

■■■ The effect of the *culpa in contrahendo* doctrine, when it applies, is that a party may be liable in damages, even in the absence of a binding agreement, if it fails to negotiate in good faith **when the other party had reasonable expectations that an agreement would finally be reached among the parties.** *Glamorous Nails,* 2006 WL 345008, *6, 2006 T.S.P.R. 16 (our emphasis and translation). The doctrine applies even if the Defendant's conduct was not intentional, but merely negligent, *id.,* at 2006 WL 345008, *7, and it is meant "to compensate a party for the expenses it incurred in reliance on the other party's offer to form a contract when the contract negotiations break down." *Velazquez–Casillas v. Forest Labs., Inc.,* 90 F.Supp.2d 161, 166 (D.P.R.2000) (citations omitted). In other words, the *culpa in contrahendo* doctrine may be used to compensate the party who relied on the

other party's conduct as indicative that a final agreement would eventually be reached. *Glamorous Nails,* 2006 WL 345008, *10, 2006 T.S.P.R. 16.

■■■ In determining whether liability for *culpa in contrahendo* attaches to a defendant, the Court may consider the following factors: the development of the negotiations, how did they begin, their course, the conduct of the parties throughout the negotiations, the stage at which the interruption in negotiations took place, and the parties' reasonable expectations to form a contract. *Tommy Muniz,* 113 D.P.R. at 529. However, in order to impose liability under this doctrine, there must be a finding of bad faith or fault on the part of the party who terminated the negotiations. *Id.* Although there is no direct evidence of bad faith on the record before us, there are issues of fact surrounding Centennial's sudden decision, unbeknownst to WHTV and Sala, to terminate the Agreement that make the entry of summary judgment on this claim inappropriate.

The parties in this case began negotiations in the Summer of 2000. They executed the Agreement on November 29, 2000. While Defendants have introduced sworn testimony that the results of their due diligence as to the financial and technological aspects of the deal may not have rendered the expected results, they have no evidence whatsoever that they alerted Plaintiffs of these results at **anytime prior to April 24, 2001,** when they decided to terminate the Agreement. On the other hand, Plaintiffs have provided this court with evidence that shows that Centennial did not alert them of the problems found in the due diligence until the very same day they decided to terminate the Agreement. *See,* Docket # 99, Ex. 17, pp. 1–4, 23–28. Meanwhile, Plaintiffs provided Defendants with all requested documentation, access to information and personnel; kept

Centennial informed of the developments in the BTA negotiations (Docket # 99 SUF No. 26); on January 25, 2001, met with Defendants to discuss pending due diligence (Docket # 99 SUF No. 28); again, met with Centennial on February 13, 2001, to discuss issues pertaining to Centennial's due diligence (Docket # 99 SUF No. 29); and, on March 16, 2001, asked Centennial in writing to confirm their interest in acquiring the Business (Docket # 99 SUF No. 32). During this time, Plaintiffs also continued negotiating with Jung to acquire the BTA licenses on behalf of Centennial, (Docket # 99 SUF No. 24). At no point during all this time were Plaintiffs appraised of the difficulties ahead and the possibility of those difficulties dooming the deal. Instead, Defendants proceeded with the negotiations, actively participating in the negotiations of the BTA licenses (Docket # 99 SUF No. 27) and encouraging the drafting of the definitive agreement (Docket # 99 SUF No. 34); *see also*, Docket # 99, Exs. 1 & 17. With this scenario, the entry of summary judgment finding that Centennial at all times acted in good faith and while employing reasonable commercial efforts is inappropriate. We leave it to the trier of fact to draw the necessary conclusions from the conduct of the parties and the facts leading up to the termination of the Agreement.

**Conclusion**

Per the foregoing, Defendants' motion for summary judgment is **GRANTED in part and DENIED in part.** The parties are reminded that a **Pretrial and Settlement Conference is scheduled for November 6, 2006 at 2:30 p.m. and Jury Trial remains set to begin on December 4, 2006 at 9:00 a.m.**

**SO ORDERED.**